416 F.2d 123
 UNITED STATES of America, Appellant,
v.
The SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL UNION NO. 36, AFL-CIO; and the Local No. 1 of the International Brotherhood of Electrical Workers, A.F.L.-C.I.O, Appellees.
 No. 19316.
 United States Court of Appeals Eighth Circuit.
 September 16, 1969.
 
 Stephen J. Pollak, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for appellant; Nathan Lewin and Gerald W. Jones and Carol R. Aronoff, Attys., Dept. of Justice, Washington, D. C., on the brief.
 Charles A. Werner, St. Louis, Mo., for appellee Sheet Metal Workers Int'l Assn. Local 36; Stanley R. Schuchat, St. Louis, Mo., on the brief.
 James K. Cook, St. Louis, Mo., for appellee Local No. 1 of the International Brotherhood of Electrical Workers; Stanley R. Schuchat, St. Louis, Mo., on the brief.
 Before BLACKMUN, MEHAFFY and HEANEY, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 The Attorney General brought an action on February 4, 1966, against Local 1 and Local 36[1] charging them with engaging in a "pattern or practice" of discrimination against Negroes on account of their race in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e to 2000e-15.[2]
 
 
 2
 The trial court found: (1) that both Locals excluded Negroes prior to 1964;[3] (2) that the record was devoid of specific instances of discrimination by either Local after July 2, 1965, the effective date of the Act; (3) that both Locals made a post-Act effort to recruit Negroes and to advise them of their rights to membership and related benefits;[4] and (4) that no complaints of discrimination by either Local had been made to any governmental agency.[5] The court concluded:
 
 
 3
 "The Civil Rights Act of 1964 was not intended to penalize unions or others for their sins prior to the effective date of the Act. It is prospective only. Neither was it passed to destroy seniority rights in unions or in business. The Act specifically forbids a union or a business from giving preferential treatment to Negroes to correct an existing imbalance of whites. In order to be a violation of this Act, there must be an intentional pattern and practice of discrimination and not an isolated instance of discrimination. There is no pattern or practice of discrimination in this case since the effective date of the Act."
 
 
 4
 United States v. Sheet Metal Wkrs. Int. Ass'n, L. U. No. 36, 280 F.Supp. 719, 730 (E.D.Mo.1968).
 
 
 5
 The government asks this Court to reverse the trial court. It argues that it is not necessary to prove that a number of Negroes sought and were denied union membership or related benefits to establish a pattern or practice of discrimination. It asserts that the Act casts upon those subject to its provisions not merely the duty to follow racially neutral employment policies in the future but an obligation to correct or revise practices which would perpetuate racial discrimination. It specifically requests that we find: (1) that both locals are continuing to discriminate against Negroes in the operation of their employment referral systems, (2) that both Locals are continuing to discriminate against Negroes in their admission policies, and (3) that both Locals had failed to publicize their abandonment of racially discriminatory policies and that they have an affirmative obligation to do so.
 
 
 6
 It asks that the matter be remanded to the District Court for the entry of an appropriate remedial order.
 
 
 7
 We first consider the general question of whether it was necessary for the government to prove that the Locals have refused membership or work referral to Negroes since the effective date of the Act. We answer this question in the negative. Our reasons for doing so are outlined below and developed more fully in subsequent sections of the opinion.
 
 
 8
 (1) The Locals continued to exclude Negroes from membership, apprenticeship training, and work referral after the Act became effective in violation of § 703(c) (1) of the Act.[6]
 
 
 9
 (a) The trial court correctly found that both Locals excluded Negroes prior to 1964. There is no evidence indicating that its exclusionary policies were changed in that year or that they were changed by July 2, 1965. Indeed, the inference to the contrary is so strong as to require that it be made.[7]
 
 
 10
 (b) Local 1 did not admit its first Negro member until March, 1966. (As of the date of oral argument, it had accepted sixteen Negro members.) It did not accept its first Negro apprentice until February, 1966. There is no record of a Negro being referred for employment prior to March, 1966. A qualified young Negro who sought membership in the union and employment in the industry received evasive responses from the Local as late as December, 1965.[8]
 
 
 11
 (c) Local 36 had no Negro members as of the date of trial — June, 1967. It had 1,275 white members. It accepted its second and third Negro apprentices in 1967. There is no record of any Negro having used its hiring hall prior to the date of trial.
 
 
 12
 (d) Both Locals pursued a pre- and post-Act policy of organizing white contractors with white employees. Neither attempted to organize Negro contractors with Negro employees until November, 1966.[9] The 1966 organizational efforts were limited to meeting with some of the members of the Midwest Contractors Association who employed Negroes and advised them that the Locals would be willing to sign contracts with them and accept their employees as members. See, Brown v. Post, 279 F.Supp. 60 (W.D.La. 1968).
 
 
 13
 (e) Both Locals discouraged their members from working on construction jobs on which Negro craftsmen or Negro contractors were employed. As late as December, 1965, the Building and Construction Trades Council of St. Louis, AFL-CIO, issued a policy statement that its affiliates would not work on construction projects in St. Louis unless the project was manned entirely by AFL-CIO members. Pursuant to this policy, Local 1 and Local 36, among others, boycotted the "Arch" project in St. Louis when Negro craftsmen belonging to an independent union were employed. The minutes of Local 36 reported:
 
 
 14
 "Bus. Manager E. Zimmerman then made his report.
 
 
 15
 "He gave a detailed account of the C.I.U.'s infiltration into the St. Louis Bldg. Trades area.
 
 
 16
 "The Rec. Secy read a referendum received from the St. Louis Bldg. Trades Council. Requesting that all organizations go on record to accept the pledge of not working on a construction job with anyone who does not belong to the St. Louis Bldg. Trades Council, AFL-CIO. The motion to adopt this Resolution * * * was passed unanimously."
 
 
 17
 Work resumed only after an injunction ordering an end to the boycott was issued on February 7, 1966. See, United States v. Building & Const. Tr. Coun. of St. Louis, Mo., 271 F.Supp. 447 (E.D. Mo.1966); International Brotherhood of Electrical Workers, Local 1, AFL-CIO, et al., 164 N.L.R.B. No. 40, 65 L.R.R.M. 1113 (1967). This incident appears to have been a factor in precipitating this action.
 
 
 18
 (f) The Locals instituted a public relations program in January of 1966 to inform the community that their apprenticeship training programs were of a nondiscriminatory nature. It took no similar step with reference to the right to membership and the right to use the Locals' employment referral systems.
 
 
 19
 (2) The Local's employment referral systems are operated in a discriminatory manner in violation of § 703(c) (2) of the Act.[10]
 
 
 20
 (a) The collective bargaining agreements of the Locals require persons working under them to become union members in less than a month,[11] a requirement which Negroes could not fulfill during the period that the Locals' policy of exclusion was in effect. Furthermore, since most of the construction work was performed by the members of the Locals,[12] qualified Negroes could not work as members and had difficulty obtaining jobs as nonmembers.
 
 
 21
 (b) Local 1 continued, through the date of oral argument before this Court, to refer persons for employment on the basis of pre-Act experience in the industry and pre-Act experience under its collective bargaining agreement — experience which Negroes were unable to secure.
 
 
 22
 (c) Local 36 revised its employment referral system in 1966 to provide that persons would be referred for employment on the basis of pre-Act experience in the industry and pre-Act experience under the collective bargaining agreement — experience which Negro employees were unable to obtain.
 
 
 23
 With this brief summary, we turn to a detailed discussion of the government's contention that the Locals' employment referral systems necessarily discriminate against Negroes.
 
 
 24
 Prior to the passage of the Act, both Locals negotiated collective bargaining agreements which established systems for referring persons for employment. Both systems were designed to provide maximum employment opportunities for members consistent with the provisions of the Taft-Hartley Act prohibiting the closed shop.
 
 
 25
 Local 1 negotiated an agreement establishing an exclusive hiring hall in November of 1958. The agreement is still in effect. It accords priority for work referral on the basis of four priority groups. To be eligible for Groups I or II, an applicant must be a resident of the area, have five or more years experience in the electrical construction industry, pass a written journeyman's examination administered by an IBEW Local — an examination Negroes were not permitted to take until 1966 — and have been employed at least one of the last four years (Group I) or last three years (Group II) under a collective bargaining agreement between the union and NECA.[13] To be eligible for Group III, an applicant must have five or more years of experience in the electrical construction industry and have been employed for at least six months in the last three years under a collective bargaining agreement between the parties. All applicants with one year's experience in the electrical construction industry are eligible for Group IV. All other applicants are placed in an unnumbered group and are referred for employment only after employees in the priority groups have been referred. The Local maintains an out-of-work list in which each applicant is recorded within his group in the order in which he registered for employment. Applicants are, with some exceptions, referred to employers in chronological order. An applicant must be physically present to be referred. Applicants are required to join the Local — a requirement Negroes were not permitted to meet prior to 1966 — within thirty-one days of the date of their initial hire. No Negroes were referred for employment prior to 1966.
 
 
 26
 At the time of trial, Local 36 had a nonexclusive referral system which permitted anyone, including nonmembers, looking for work in the sheet metal trade to use the Local's hiring hall. Applicants were required to sign an out-of-work card which was stamped with the date and time it was signed. Applicants were then placed on an out-of-work list in the order stamped on the card. When a contractor called the Local's hiring hall for a craftsman, the top man on the list possessing special skill for a particular job was referred regardless of whether or not he was a Local member. All persons employed by a contractor were required to become members of the Local — a requirement Negroes were not permitted to meet prior to July 2, 1965 — within eight days after employment. No Negroes were referred for employment prior to trial.
 
 
 27
 In 1966, Local 36 negotiated a new exclusive referral system, similar to that of Local 1, to be effective January 1, 1968. It established four priority employment groups. To qualify for Group I, an applicant must be a resident, have four years construction experience — one of which must be under the collective bargaining agreement — and pass an examination given by a Local of the Sheet Metal Workers' International Association or by the Joint Committee. To be eligible for Group II, an applicant must have four years of construction experience and pass a similar examination. To be eligible for Group III, an applicant must have one year's construction experience. To be eligible for Group IV, the applicant must be a high school graduate or a college student. The latter category is used from June through September.
 
 
 28
 It is clear that Local 1's referral system was operated on a discriminatory (exclusionary) basis prior to 1966. Negroes were barred from using the hiring hall, they were denied the right to take a journeyman's examination, and they were prohibited from joining the Local. As a result of these discriminatory practices, they were unable to gain experience under the collective bargaining agreement. Furthermore, it was very difficult for them to gain experience elsewhere in the electrical construction industry because Local 1 controlled most of the work.
 
 
 29
 Local 1 contends that it now accepts Negroes into membership. It has accepted two (both were formerly members of a nonconstruction division of the Local). It contends that it now permits Negroes to take a journeyman's examination. It has permitted two. It contends that Negroes are now permitted to use the facilities of the hiring hall. Two have used it. The Local has also organized two Negro contractors (who had previously sought and have been denied membership) with fourteen Negro employees.[14] Their employees have been accepted as members, and presumably will be permitted to use the facilities of the hiring hall. Even if it is assumed that Negroes have been permitted since the passage of the Act to take a journeyman's examination, to join the Local and to use the hiring hall, the highest priority group in which a Negro can expect to be placed if he takes and passes a journeyman's examination and joins the Local is Group IV. Under the collective bargaining agreement, he would still lack the experience required for a higher classification. Furthermore, he would have to have at least one year of experience to be placed in Group IV. It is clear that employment opportunities for persons in Group IV, or the lower unnumbered group, are substantially less than for persons in the higher groups. Indeed, the referral system was established to assist in preserving work opportunities for those who had worked in the trade for a union contractor over a period of time. It also follows, however, that Negroes qualified to do the work customarily performed by a journeyman electrician are deprived of an opportunity to be placed in a priority group in which they would have a reasonable opportunity to make a living. And they are so deprived because they were denied the opportunity to gain experience under the collective bargaining agreement or in the industry before the Act was passed.
 
 
 30
 It is equally clear that Local 36 did not permit Negroes to take a journeyman's examination, to join the Local, or to use its hiring hall prior to 1967. The Local built the discriminatory practices into its employment referral system by negotiating a new system of referring persons for employment by priority groups, and by giving preference to those who had an opportunity to gain experience under the collective bargaining agreement and in the industry prior to its effective date.
 
 
 31
 In our view, neither Local can be permitted to continue to operate its employment referral systems without change. Both plans effectively operate to deprive qualified Negroes of an equal opportunity for employment as journeymen electricians or as sheet metal workers. Because the plans carry forward the effects of former discriminatory practices, they result in present and future discrimination and are violative of Title VII of the Act.[15]
 
 
 32
 We recognize that each of the cases cited in n. 15 to support our position can be distinguished on the ground that in each case, a number of known members of a minority group had been discriminated against after the passage of the Civil Rights Act. Here, we do not have such evidence, but we do not believe that it is necessary. The record does show that qualified Negro tradesmen have been and continue to be residents of the area. It further shows that they were acutely aware of the Locals' policies toward minority groups. It is also clear that they knew that even if they were permitted to use the referral system and become members of the union, they would have to work for at least a year before they could move into a priority group which would assure them reasonably full employment. In the light of this knowledge, it is unreasonable to expect that any Negro tradesman working for a Negro contractor or a nonconstruction white employer would seek to use the referral systems or to join either Local.
 
 
 33
 If the Locals desire to retain the referral systems, modifications must be made in the collective bargaining agreements[16] and in the referral systems to permit Negroes who are reasonably qualified (capable of performing that work ordinarily required of a journeyman craftsman)[17] to register for employment at the Locals' hiring halls and to be placed in the highest group for which they qualify. The specific modifications shall be worked out by the parties and shall be approved by the trial court. They shall generally conform to the follow standards:[18]
 
 
 34
 (1) The residency requirements of both Locals are nondiscriminatory and need not be changed.
 
 
 35
 (2) The experience requirements must be modified:
 
 
 36
 (a) Experience under the collective bargaining agreement shall not be required of Negroes meeting the requirements set forth in (b) and (c) of this section.[19]
 
 
 37
 (b) Negroes with the requisite years of experience in the construction industry (five years for electricians and four years for sheet metal workers) who desire to register for employment shall be permitted to do so within a reasonable time and shall be placed in Group I. They shall be referred for employment from this group. After being employed, they shall be permitted to take a journeyman's examination. The examination shall be an objective one designed to determine whether the applicants are reasonably qualified. If they pass the examination, they shall have a continuing right to be referred for employment from Group I. Negroes who do not have the requisite experience as of the date of this opinion, but who acquire such experience within the next five (Local 1) and four (Local 36) years shall be given the same opportunity. Experience under the collective bargaining agreement shall not be required of Negroes meeting the qualifications noted above.
 
 
 38
 (c) Negroes without construction experience who are beyond the apprenticeship age and who have as of the date of this opinion been residents of the area for at least five (Local 1) and four (Local 36) years shall, on request to the Local, if they are qualified to be a journeyman by other than construction experience, be given a reasonable opportunity to take a journeyman's examination under the conditions set forth in (b) and placed in Group I if they pass the examination. The parties shall, under the trial court's supervision, develop a procedure for determining, from written applications, whether a resident Negro applicant has that experience and training which appears to qualify him to take the examination. Negroes who do not have the requisite experience as of the date of this opinion but who acquire it during the next five years shall be given the same opportunity.
 
 
 39
 (3) Negroes without construction experience who are beyond the apprenticeship age shall, on request to the Local, if they are shown to have other reasonably comparable experience, be given an opportunity for work referral in Group IV (Local 1) or Group III (Local 36).
 
 
 40
 (4) Reasonable steps shall be taken to make it known to the Negro community that all persons are now permitted to use the referral system without respect to race, color or creed.
 
 
 41
 In requiring the modifications, we impose no quotas, we grant no preferences.
 
 
 42
 Nor do we deprive any non-Negro craftsman of bona fide seniority rights.[20] Each such craftsman will remain in the group to which he is now assigned and will move to a higher group when he has satisfied the eligibility requirements. We do make it possible, however, for qualified Negroes — those who have been deprived of the opportunity to gain experience in the construction industry or to gain experience under the collective bargaining agreement — to be placed in the group where they will have an equal opportunity to be referred for work.
 
 THE ADMISSIONS POLICIES OF THE LOCALS
 
 43
 We next consider the government's contention that both Locals are continuing to discriminate against Negroes in determining their eligibility for membership, and that Local 36 discriminates against Negroes with reference to initiation fees.
 
 
 44
 A brief résumé of the policies of both Locals governing the admission of members will be helpful in understanding the government's contentions.
 
 
 45
 To be eligible for membership in the construction division of Local 1, an applicant must: (1) be at least sixteen years of age, (2) be of good character, (3) pass an examination, and (4) be a resident of the area, be employed at the electrical trade within the jurisdiction of the Local, and be working under a Local 1 collective bargaining agreement. The name of each applicant is required to be read at a regular meeting of the Local. Thereafter, the executive board of the Local reviews the applicant's qualifications and reports to the membership. If this report is favorable, the members of the Local vote upon the admission of the applicant. Every member in attendance at a regular membership meeting votes on all applications for membership. Applicants may be submitted to the voting procedure individually or as a group.
 
 
 46
 The minutes of the Local's regular meetings, from February 1, 1952, to September 1, 1966, disclose only thirteen instances in which the membership denied admission to an applicant. No reasons for the denials are recorded, but there is no cause to believe that race or color was a factor.
 
 
 47
 Membership in Local 1 may be obtained in four ways: (1) by application, (2) by completing the apprenticeship training program, (3) by transfer from a nonconstruction classification (an applicant must have at least five years experience in the nonconstruction classification), and (4) by admission through an organizational campaign.
 
 
 48
 To be eligible for admission to Local 36, an applicant must (1) have good moral character and (2) be employed in the sheet metal trade within the jurisdiction of the Local.
 
 
 49
 Admission to membership in Local 36 can be obtained in three ways: (1) by application (including those situations where employees of nonunion contractors are organized), (2) by completion of the apprenticeship training program, and (3) by transfer from another Local.
 
 
 50
 An applicant is required to file an application for a journeyman sheet metal worker examination and an application for membership. It must be countersigned by "two good standing members of the Local." In practice, this requirement is routinely fulfilled by members of the executive board. The application for the examination elicits information which tends to reflect his experience in the trade. The applicant is then scheduled to take a test which is administered by the apprentice instructor, Edward Schultz — a Local 36 member. The examination consists of three sets of written questions — the Purdue Sheet Metal Test, a layout problem and a welding test. The testing time varies from one to four hours. Schultz notes the scores on the test sheets and adds personal comments as to why a person is or is not qualified. No passing score is established. Neither the test sheets nor the scores on them are forwarded to anyone. Schultz simply notifies the Business Agent that the applicant is qualified or that he is not qualified.
 
 
 51
 The applicant is required to pay an initiation fee equal to one hundred times the hourly rate or somewhat more than $500 at the time of trial. When the initiation fee is paid in full, the applicant is initiated into membership. No vote by the membership is required.
 
 
 52
 No examination is required of persons who are selected for membership during an organizational campaign. The initiation fee for such applicants is reduced from a sum in excess of $500 to a range of $50 to $150.
 
 
 53
 The government contends that the membership vote requirement of Local 1 and the practice in Local 36 of relying on the judgment of Edward Schultz to determine whether an applicant has passed the journeyman's examination are violative of Title VII of the Act. It contends that each procedure is defective "because it vests absolute discretion in a body or individual which has, in the past, shown a tendency to racial discrimination and which is not prevented from exercising that same bent today."
 
 
 54
 We cannot accept the government's view insofar as it relates to Local 1. There is nothing in the record to indicate that its members, once the policy of admitting Negroes generally is established, would refuse to vote in individual Negroes who successfully passed a journeyman's examination. While Local 1 has discriminated against Negroes, it has used other techniques. Under such circumstances, we are reluctant to require that the voting procedure be eliminated. We also note that this decision requires the District Court to retain jurisdiction of this matter until it is reasonably satisfied that the Locals are no longer discriminating. It will, therefore, be able to hear and determine any charge involving an allegedly discriminatory vote of the membership on an applicant.
 
 
 55
 The government's contention that Local 36 continues to violate Title VII by permitting a single member of the Local, Mr. Schultz, to conduct and grade journeymen's examinations in the manner he does is well taken:
 
 
 56
 (1) The examinations are a prerequisite to employment. A passing grade is essential to all who are required to take them. A person's very right to earn a living in the trade of his choice is involved.
 
 
 57
 (2) As long as the examinations are partially subjective in nature and are graded "Pass" or "fail," with no established standard for either grade, there is no practical way in which the judgment of the examiner can be reviewed.
 
 
 58
 (3) In the light of Local 36's pre-1967 record of excluding Negroes and a post-1967 record of discriminating against them as to membership and related benefits, it is essential that journeymen's examinations be objective in nature, that they be designed to test the ability of the applicant to do that work usually required of a journeyman and that they be given and graded in such a manner as to permit review. (The Local gives such an examination to apprentices.) Compare, Dobbins v. Local 212, International Bro. of Elec. Wkrs., 292 F.Supp. 413, 447, 464, 465 (S.D.Ohio 1968).
 
 
 59
 In reaching this conclusion, we do not necessarily accept the government's contention that Mr. Schultz, as an individual, would, because of his past participation in the exclusionary policies of the Local, discriminate against Negroes in giving and grading journeymen's examinations. We are not here concerned with the individual who gives and grades the examination. We are concerned rather with the system, the nature of the examination, its objectivity and its susceptibility to review.
 
 
 60
 The government also contends that Local 36 discriminates against Negroes with respect to initiation fees. It argues that Local 36 had a pre-Act policy of limiting its organizational efforts to white contractors employing white journeymen; that this policy has continued since the passage of the Act; that the journeymen accepted in the organizing campaigns are given the benefit of special initiation fees ranging from $50 to $150, compared with the regular initiation fee of more than $500; that these policies permit the Local to maintain effective control over its membership and are discriminatory as to Negroes. It asserts that the District Court should have enjoined the practice and directed that initiation fees be equalized.
 
 
 61
 We are convinced from a review of the evidence that Local 36 did not attempt to organize Negro contractors with Negro employees until late 1966. It was not until December of 1966 — eighteen months after the Act became effective — that the Local made any move in this direction. The attempt was limited to a single meeting with Negro contractors and leaving application cards, for employees to sign, at the office of one of them.
 
 
 62
 The Local argues that it was prevented from making an earlier move by the fact that the contractors were under an agreement with Local 99 for the period June 15, 1965, to March 1, 1967. It cites Leonard Wholesale Meats, 136 N.L.R.B. No. 103, 49 L.R.R.M. 1470 (1962), and Deluxe Metal Furniture Co., 121 N.L.R.B. No. 135, 42 L.R.R.M. 1901 (1958), in support of its position. There are a number of answers to this contention: (1) The contract bar doctrine would not stand in the way if the contractors and Local 99 agreed to set the contract aside. (2) The Act was passed before June 15, 1965, the date the contract was signed. (3) No effort was made to persuade the Negro members of Local 99 to affiliate with Local 36.
 
 
 63
 We have some difficulty in understanding the government's request for relief. It appears to ask this Court to instruct the District Court to require Local 36 to discontinue the practice of charging a higher initiation fee for persons who come into the Local through direct application or through the apprenticeship training program than it charges those who come into the union during the course of an organizational campaign. In our view, the certain result of such a decree would be the setting of all initiation fees by the Local at the higher, $500 plus, figure. Such an action would hardly operate to assist Negroes who have been discriminated against.
 
 
 64
 We remand to the District Court with instructions to it to require Local 36 to fix its initiation fees, for a reasonable time, for Negroes who are currently employed or who were employed at any time subsequent to July 2, 1965, by a nonunion sheet metal contractor, at a sum equal to the approximate average of the initiation fees charged to "organized employees" between July 2, 1965, and December, 1966.
 
 
 65
 Whether Negroes employed by nonunion contractors in the future will be entitled to a similar privilege will depend entirely on Local 36. If it seeks to organize such employers with the same vigor as it does those with white employees, the discrimination will have ended. If not, the decree will have to be continued.
 
 THE FAILURE TO PUBLICIZE
 
 66
 The government contends that the Locals made an inadequate effort to publicize the change in their policies with respect to admitting Negroes to the apprenticeship programs and made no effort to inform as to the alleged changes with respect to membership and the employment referral systems. We first consider the efforts with respect to the apprenticeship programs.
 
 
 67
 Local 1's apprenticeship program is administered by a Joint Committee consisting of three Local 1 representatives and three electrical contractors. Applications are taken and written examinations given at the union hall. Forty to fifty apprentices are accepted each year. Applicants must be between the ages of sixteen and twenty-five.
 
 
 68
 The areas tested are personal adaptability, mathematical knowledge, mechanical ability and mechanical comprehension. The tests given are objective, with answers being right or wrong. The tests are graded by the president of Local 1. Applicants passing the test are listed in the order of their test scores, and are interviewed by at least one employer and one union member of the Committee. From the interviewer's evaluation forms, a compound evaluation sheet is filled out establishing the average of the scores given the applicant by each interviewer. All persons who are interviewed are relisted in the order of their scores. A contractor desiring an apprentice must select the highest man on the list. An applicant is permitted to appeal to a tribunal established for the purpose.
 
 
 69
 The program provides for five years of training, 8,000 hours on the job and 880 hours of related classroom instruction. Apprentices are accepted as journeymen on completion of their training and placed in Group I.
 
 
 70
 Local 1's by-laws historically gave priority for apprenticeship training to sons of union members. The provision in the by-laws authorizing this practice was deleted in March of 1964, in compliance with the Labor Department's anti-discrimination apprenticeship standards. 29 C.F.R., Part 30. In a further effort at compliance, Local 1 destroyed between five and six thousand applications in 1964. Notwithstanding the deletion and the fresh start on applications, 60% of the apprentices accepted in 1965 and 43% of those accepted in 1966 were related to present members by blood or marriage.
 
 
 71
 Local 36's apprenticeship program is sponsored by a Joint Apprenticeship Committee consisting of three members of Local 36 and three sheet metal contractors. Applications are made at the union hall, and the applicant is tested by an independent testing agency. Applicants must be between the ages of seventeen and twenty-three (up to twenty-five if a veteran). The tests include questions on verbal reasoning, mathematics, numerical and abstract reasoning, mechanics, language usage, grammar, spelling and finger dexterity.
 
 
 72
 Those taking the tests are interviewed by the members of the Joint Apprenticeship Committee. Each member of the Committee scores the interview independently, and at the conclusion of the interview, the results are averaged. The interview consists of questions concerning working experience, military service, group activities, interest in the trade, attitude and technical knowledge relating to the trade. Points are given for particular courses taken during school, and these points are then combined with the average score of the interviews — with a maximum total of 100 points being possible. The points obtained on the tests are then added to the interview and education points, and all applicants with a combined score of 80 points — out of the maximum total of 200 points — are notified in writing that they are acceptable for training.
 
 
 73
 The applicants are then placed upon a waiting list according to their combined point score. A contractor desiring an apprentice is assigned the top applicant on the list. The apprenticeship period is four years (8,000 hours). During this period, the apprentice engages in both on-the-job training and four hours per week of technical training and schooling at O'Fallon Technical High School.
 
 
 74
 The Sheet Metal Workers' Apprenticeship Program was certified by the U. S. Department of Labor's Bureau of Apprenticeship and Training as being in compliance with 29 C.F.R., Part 30.
 
 
 75
 Local 36 followed a declared nepotistic policy until 1965. Even though it had formally abandoned that policy by 1966, more than a third of the apprentices accepted in that year were related to present members.
 
 
 76
 On the basis of the above evidence, the trial court found: (1) that both Locals were presently operating their apprenticeship programs on a nondiscriminatory basis in conformity with the standards established by the Department of Labor's Bureau of Apprenticeship and Training, and (2) that both Locals had made and were making a determined effort to inform Negroes of their nondiscriminatory policy.
 
 
 77
 The government challenges only the latter finding. It contends that "the court failed to evaluate the effectiveness, thoroughness and frequency of [the Locals' attempts to inform Negroes of the nondiscriminatory nature of the program]." It requests that the Locals be required to undertake more comprehensive and effective programs.
 
 
 78
 Neither Local publicized the fact that Negroes would be accepted for apprenticeship training until approximately the time this action was initiated. They did the following thereafter: Representatives of Local 1 appeared at three predominantly Negro schools — Soldan High School, April 29, 1966; Enright Middle School, May 18, 1966; Dunbar and Blewett Elementary Schools, in August of 1966. They advised the students as to the qualifications necessary for application, the procedures for application, the ways of selecting apprentices and the opportunities in the trade.
 
 
 79
 Representatives of Local 1 also met with area high school counsellors on two occasions: February 19, 1966, and May 25, 1966. They informed the participants that the apprenticeship training was operated on a nondiscriminatory basis.
 
 
 80
 On February 20, 1966, representatives of Local 36 and the Joint Apprenticeship Committee contacted the St. Louis Post-Dispatch for the purpose of relating information with respect to the apprenticeship program. The resulting story was published on February 20, 1966. It contained the following passage:
 
 
 81
 "Officers emphasize that the program is `color-blind', that there is no discrimination because of race. However, there has been a noticeable lack of Negro applicants, they concede.
 
 
 82
 "`We have not had one Negro applicant in the last year,' Eugene Zimmerman, business manager of Local 36 said. `Not one has taken the initiative to apply.' "`One Negro is in his third year in the apprentice program,' Zimmerman said."
 
 
 83
 On April 13, 1967, the Joint Apprenticeship Committee mailed letters to eighty-four schools, agencies and organizations stating that the Joint Apprenticeship Committee accepts applications on every third Monday of every month. A booklet summarizing the qualifications and procedures of the program was enclosed. The letter and the booklet both stressed that "[A]ll applications will be received without regard to the race, color, religion, sex or national origin of the applicant."
 
 
 84
 Both Locals participate in the Apprenticeship Information Center (A.I.C.) at the Missouri Division of Employment Security. The purpose of this agency is to gather information from various apprenticeship committees and other employers of apprentices for dissemination to schools and interested organizations and persons.
 
 
 85
 The A.I.C. distributes bulletins setting forth the qualifications for craft apprenticeship programs, including those of Local 1 and Local 36. Negro organizations included on the mailing list are: NAACP, CORE, ACTION, Human Development Corporation, and Work Experience Project. Bulletins were issued on the following dates: January 10, January 28, March 11 and November 3, 1966; and April 6 and April 24, 1967. The bulletins did, however, not indicate that the apprenticeship training programs were nondiscriminatory in nature.
 
 
 86
 The A.I.C. also issued newspaper, radio and television releases concerning opportunities in the different trades. The news media which received these releases included five St. Louis newspapers labeled as the "Negro Press," various community-wide neighborhood newspapers and area radio and TV stations. News releases were made on the following dates: January 17, 1966, January 19, 1966, January 25, 1966, March 21, 1966, May 4, 1967, May 9, 1967, May 10, 1967, May 14, 1967 and June 15, 1967. Again, none of the releases stated that the apprenticeship programs were nondiscriminatory.
 
 
 87
 The A.I.C. also furnished speakers for Career Day programs in area high schools, including those with predominantly Negro student bodies. The record does not indicate the content of these programs.
 
 
 88
 The effectiveness, thoroughness and frequency of the efforts of the Locals to inform Negroes that the apprenticeship training programs were at long last being operated in a nondiscriminatory manner must be viewed in the light of (1) the fact that Negroes were excluded from membership in the Locals until 1966, (2) the fact that both Locals historically gave preference to those related to members, and (3) the fact that individual union members will inevitably continue to talk with their sons about opportunities available to them in the trades.
 
 
 89
 When so viewed, the efforts of the Locals fall short of what is necessary. While it is not the intention of this Court to minimize what has been accomplished by the Joint Committees and the Locals in making the public aware of the now nondiscriminatory character of the program, we cannot believe that what has been done is all that can be reasonably expected. The school appearances do not appear to have been conducted on a regular basis. Only two meetings were held with high school counsellors. The A.I.C. bulletins did not indicate that the programs were open to persons of every race and color.
 
 
 90
 We recognize that the best of publicity programs will not fully convince Negroes that they now have the opportunity to attempt to qualify for apprenticeship training. We also recognize that no such program can hope to be as effective as parental guidance, but a good public information program can help to persuade the doubtful and the skeptical that the discriminatory bars have been removed. Such a program is mandatory. It shall be worked out by the parties and submitted to the District Court for approval.
 
 
 91
 Finally, we note that we are not here concerned with the question of whether a labor organization which discriminated against Negroes prior to the Act but discontinued such discrimination when the Act became effective must, at the risk of being held to have violated the Act, publicize the fact that it has abandoned its discriminatory policies and practices. See, Dobbins v. Local 212, International Bro. of Elec. Wkrs., 292 F. Supp. at 444, 445. Here, the discriminatory policies and practices continued after July 2, 1965. The question thus is whether the courts are authorized, under § 707 (a) (3) of the Act,[21] to require unions to publicize the fact that membership and related benefits have been opened to all persons. We hold that they can be so required. In our view, the Court's authority is not limited by § 703(j) which provides that nothing in the Act "shall be interpreted to require any * * *, labor organization, * * * to grant preferential treatment to any individual or to any group because of race, [or] color." See, Rachlin, Title VII: Limitations and Qualifications, 7 B.C.Ind. & Com.L.Rev. 473, 491-492 (1966). In the light of this holding, it is obviously unnecessary to discuss further the right of the District Court to require the Locals to institute a public information program with respect to membership and employment referral similar in context to that required with respect to the apprenticeship program. It has the right and should exercise it in a manner consistent with the views expressed herein.
 
 SUMMARY
 
 92
 We have held in this opinion: (1) that Local 1 and Local 36 committed unlawful employment practices by excluding Negroes from membership in the Locals, from participation in the apprenticeship training programs and from using the Locals' employment referral systems; (2) that Local 1 and Local 36 are continuing to violate the Act by discriminating against Negroes in the operation of their employment referral systems; and (3) that Local 36 is continuing to violate the Act by conducting its journeyman's examination in a discriminatory manner and by pursuing an organizing policy that results in discrimination against Negroes.
 
 
 93
 We have outlined the manner in which the employment referral systems must be modified. We have stated that Local 36 must modify its examination procedure, and we have outlined steps which Local 36 must take to undo the effects of its discriminatory organizational policies. We have held that both Locals are obligated to undertake an effective public information program designed to make it clear that Negroes now have equal opportunities for union membership and related benefits.
 
 
 94
 We have been relatively specific in the areas stated in a desire to be of assistance to the parties and the trial court in framing a decree to the end that equal opportunity will be provided to Negroes at the earliest possible time.
 
 
 95
 We reverse and remand for action consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The Building and Construction Trades Council of St. Louis, AFL-CIO — Pipe-fitters Local 562 and Plumbers Local 35 — were also named as parties defendants
 The Plumbers Local entered into the stipulation set forth below:
 "1. * * * [P]ut into effect a community relations program designed to dispel from the minds of Negroes any notion that they are not welcome in this Local equally with white persons and to make prospective Negro applicants equally aware of apprenticeships, union membership and job referrals, if any, * * *.
 "2. Institute a program to stimulate interest among young Negroes in our trade and to solicit qualifiable Negroes for journeyman membership and apprentices. In order to accomplish this the Local will:
 "a. Co-operate in the operation of remedial and preparatory training programs;
 "b. Encourage Negro members and apprentices to publicize and familiarize the Negro community with opportunities in the trade * * *; and
 "c. Establish and maintain contact with trade and secondary schools for the purpose of participating in career day exercises and other programs for developing the interest of Negro students in the trade * * *.
 "3. Encourage a program with contractors for recruiting and placing Negroes on an equal basis with white persons in summer helper positions in our trade.
 "4. Apply objective, uniform standards, reasonably related to the job requirements of the trade, * * * for participating in apprenticeship programs, for enrollment as members and for work referral, * * *. During a period of five years from the date of this Statement of Policy, or until such time as the minority races residing within the jurisdictional limits of the Local are fairly represented in its membership, whichever shall first occur:
 "a. No standard or procedure shall be applied to any Negro applicant for union membership that is more stringent than any standard or procedure used, as a matter of practice, at any time during the last five years.
 "b. All Negro applicants for membership meeting the standards referred to in this paragraph shall be accepted as members without regard to any numerical limit on membership which the Local might otherwise have set and without regard to whether or not membership is `open' or `closed' at the time.
 "c. In the event referrals for employment are made through the Local, Negro non-members shall be referred for employment on the same basis as members, without giving any preference for union membership, or for length of prior work experience or whether any part of such experience was with any particular employer or employers, provided that nothing herein shall preclude the Local from requiring minimum qualifications, including a minimum length of experience in the trade, applicable equally to all without preference or distinction.
 "5. The officers of this Local shall determine the qualifications of applicants solely on the basis of objective uniform standards. Requiring the approval, vote or vouchers of any officer or member of the Local, or of the membership or any part of the membership of the union, as a condition to the acceptance of any otherwise qualified person into union membership, apprenticeship training, or for work referral, if any, shall not be used to discriminate against any person * * *.
 "6. Publicly announce * * * to each applicant or prospective applicant in writing the procedures to be followed and the standards to be applied in accepting and acting upon applications for union membership, apprenticeship training, and work referral, * * *.
 "7. This Local or the Joint Apprenticeship Committee will maintain records showing the name, address, race, data of application and disposition of such application of each person applying for apprenticeship training, union membership, and referral for employment, * * *. * * * [T]he Department of Justice [is invited] to review all our books, records, and other documents containing such information, * * *."
 Pipefitters Local 562 signed a similar stipulation. The Building and Construction Trades Council agreed to cooperate with both Locals in effectuating the policies set forth in the stipulations.
 
 
 [2]
 Seven other actions similar to the instant one have been instituted by the Attorney General against the Building Trades' Unions. A decision in the District Court has been reached in one, United States v. Plumbers and Pipefitters, Local 73, 2 FEP Cases 81 (S.D.Ind., filed August 15, 1969); a consent decree has been reached in another, United States v. Plumbers and Pipefitters, Local 250 (C.D.Cal., February 7, 1968); no final decisions have been issued in the remaining five, United States v. Wood Lathers, Local 46 (S.D.N.Y., May 22, 1968); United States v. Ironworkers, Local 1 (N.D.Ill., April 12, 1968); United States v. IBEW Local 357 (D.C.Nev., February 19, 1968); United States v. Ironworkers, Locals 44 and 372 (S.D. Ohio, December 7, 1967); United States v. IBEW, Local 683 (S.D.Ohio, April 14, 1967)
 For discussions of the problem of minority employment and the role of Title VII of the Civil Rights Act of 1964, see: Marshall, The Negro and Organized Labor (1965); Marshall & Briggs, The Negro and Apprenticeship (1967); Norgren & Hill, Toward Fair Employment (1964); Sovern, Legal Restraints on Racial Discrimination in Employment (1966); Gould, Employment Security, Seniority and Race: The Role of Title VII of Civil Rights Act of 1964, 13 How.L.J. 1 (1967); Jackson, Using the Law to Attack Discrimination in Employment, 8 Washburn L.Rev. 189 (1969); Jenkins, Study of Federal Effort to End Job Bias: A History, A Status Report, and A Prognosis, 14 How.L.J. 259 (1968); Symposium: 1964 Civil Rights Act Title VII Equal Employment Opportunity, 7 B.C.Ind. & Com.L.Rev. 417-547, 625-652; Note, Title VII, Seniority Discrimination, and The Incumbent Negro, 80 Harv.L. Rev. 1260 (1967); Note, The Civil Rights Act of 1964 Racial Discrimination by Labor Unions, 41 St. John's L.Rev. 58 (1966); Note, Enforcement of Fair Employment Under the Civil Rights Act of 1964, 32 U.Chi.L.Rev. 430 (1965).
 
 
 [3]
 There would appear to be one exception to the Locals' policies of total exclusion. A Negro, Dorris Strong, was accepted as an apprentice by Local 36 on July 16, 1963
 
 
 [4]
 The record indicates that efforts were made to inform Negroes of their right to participate in the apprenticeship training program. The adequacy of these efforts will be discussed in a subsequent section of this opinion. There is no evidence indicating that similar efforts were made to publicize the fact that the Locals were willing to accept Negroes as members or permit them to use the hiring hall. Nor is there evidence to support the finding that the Locals made post-Act efforts to recruit Negro members. Local 36's efforts in this regard consisted of leaving application cards with the employees of one Negro sheet metal contractor. Local 1's efforts were limited to contacting Negroes who had previously been rejected by them and agreeing to accept them as members. This occurred in January of 1966
 
 
 [5]
 Both the State of Missouri and the City of St. Louis had laws prohibiting discrimination during the time Negroes were excluded from membership and related benefits. See, Missouri Fair Employment Practices Act, Vernon's Annot. Missouri §§ 296.010, 296.020 (1965), and St. Louis, Mo., Municipal Ordinance § 51512 (1962). See also, Cousin, Employment Discrimination, 24 Mo.Bar J. 280 (1968). The Civil Rights Act of 1964 also provides that individuals may file a charge of discrimination with the Equal Opportunity Commission. 42 U.S.C. § 2000e-5. The Attorney General may proceed even though no charge has been filed. Senator Humphrey observed:
 "There is no requirement for exhaustion of administrative remedies prior to exercise of this authority by the Attorney General and there is no requirement of prior referral to Federal, State or local agencies, though the Attorney General would remain free to make such referral if he deemed it useful."
 
 
 [110]
 Cong.Rec. 12724 (1964); see also, Hearings Before the House Committee on Rules on H.Res. 789, 88th Cong., 2d Sess. 19 (1964) (memorandum submitted by Representative McCulloch)
 
 
 [6]
 Section 703(c)(1) of the Civil Rights Act of 1964 provides:
 "(c) It shall be an unlawful employment practice for a labor organization —
 "(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, [or] color, * * *; * * *."
 
 
 [7]
 See, Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947); Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); 43 Ops.Cal.Atty. Gen. 200 (1964); Note, Enforcement of Fair Employment Under the Civil Rights Act of 1964, 32 U. of Chi.L.Rev. 430, 460, 461 (1965)
 When the Attorney General initiates a suit, he must prove the existence of a "pattern or practice of discrimination." The Act, in our view, permits the use of evidence of statistical probability to infer the existence of a pattern or practice of discrimination.
 "* * * Obviously, when a large company [labor organization] in an area with a diverse population is found to have no Negro employees [members], even though it hires new men regularly [accepts new members regularly] and has standard job requirements [standard membership requirements], the inference of discrimination is reasonable. * * *"
 
 
 [32]
 U. of Chi.L.Rev. at 461
 
 
 [8]
 Walter Hampton, a young Negro with five years of experience in the electrical construction industry, was sent to the union hall by Mr. Louis Sachs of Sachs Electric Company, who had a contract for electrical construction work on the "Arch," in October of 1965. He asked to join the union and was told that he could not join unless he was working for a contractor with whom Local 1 had a collective bargaining agreement. On November 8, 1965, Hampton again requested an "application to join the union." Instead of this, he was given an application for work referral rather than membership. He was placed in Group IV by the Local. Both Sachs and Local 1 failed to give Hampton the information which might have led to his employment
 The trial court found that "Hampton's testimony indicated that he did not completely understand the hiring hall procedures," and that he had not been discriminated against because he was Negro. We feel the trial court's findings are in error. It is clear that both the employer and the Local were less than frank with him. The incident also demonstrates that a qualified Negro electrician, who had been employed in the trade for five years doing work similar to that of white electricians, would, under Local 1's referral plan, be placed in the lowest priority group.
 
 
 [9]
 In 1960, a group of Negro contractors organized Local 99 of the Congress of Independent Unions. This action was triggered by the desire of Negro contractors and craftsmen to participate in an upcoming construction project in a Negro rehabilitation area. Arthur J. Kennedy, a Negro and owner of Kennedy and Sons Sheet Metal Shop, organized the Midwest Contractors' Association to bargain with Local 99 at approximately the same time
 This new arrangement met with persistent resistance by the defendants. When a group of electrician apprentices sponsored by Local 99 first attended classes at the O'Fallon Technical High School in October, 1961, the instructor, a member of Local 1 IBEW, refused to let the group enter the class until he was ordered to do so by the principal of the school. In the same month, Local 36 reported in its minutes "on the ever increasing number of incidents arising all in relationship to the problem of Negro membership in the Building and Construction Trades."
 In 1964, Frank W. Witt, a Negro electrical contractor, was forced to turn over two significant electrical jobs, one worth $48,000 and the other $20,000, because, in his words, "They [Local 1] let it be known they wouldn't allow us to do the job."
 In November of 1966, a committee from the Building and Construction Trades Council, AFL-CIO, held a meeting with the Midwest Contractors' Association. The declared purpose was to discuss the possibility of the participants negotiating collective bargaining agreements and of the Building Trades' Locals accepting employees of Association members into the Locals. The employers' committee voted to discontinue negotiations with the AFL-CIO, and to continue to deal with Local 99. Their decision was motivated at least in part by economics. The wage scale in the contract with Local 99 was substantially lower (apparently at least $2.00 an hour less) than the one in the collective bargaining agreements with AFL-CIO craft unions.
 
 
 [10]
 Section 703(c)(2) of the Act provides:
 "(c) It shall be an unlawful employment practice for a labor organization —
 * * * * *
 "(2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, [or] color, * * *; * * *" (Emphasis added.)
 
 
 [11]
 Local 1 required that membership in the union be obtained within thirty-one days of employment. Local 36 required that membership in the union be obtained within eight days
 
 
 [12]
 Local 1 and the government stipulated that Local 1 was the bargaining representative for approximately 95% of the electricians engaged in construction on major residential, commercial and industrial projects in the City of St. Louis and in St. Louis County, and that it has collective bargaining agreements with contractors who hired a substantial majority of construction electricians in the City of St. Louis and St. Louis County
 Local 36 and the government stipulated that Local 36 had collective bargaining agreements with two hundred sheet metal contractors in the area as of July 2, 1965, and that these employers include most of the sheet metal contractors in the construction industry in the area.
 
 
 [13]
 The St. Louis Branch of the National Electrical Contractors Association
 
 
 [14]
 Frank Witt, one of the Negro contractors, testified that a union representative told him that "it was about time the organization was going to move to get a Negro into the organization and that I had the first shot."
 
 
 [15]
 Local 189, United Papermakers and Paperworkers, AFL-CIO, United Papermakers and Paperworkers, AFL-CIO, CLC; and Crown Zellerbach Corporation v. United States of America, 416 F.2d 980 (5th Cir. July 28, 1969), aff'g, United States by Clark v. Local 189, United Papermakers and Paperworkers, 282 F. Supp. 39 (D.C.La.1968); Local 53 of Int. Ass'n of Heat & Frost I.&A. Wkrs. v. Vogler, 407 F.2d 1047 (5th Cir. 1969), aff'g Vogler v. McCarty, Inc., 294 F. Supp. 368 (E.D.La.1968); N.L.R.B. v. Local 269, Internat'l Bro. of Electrical Wkrs., 357 F.2d 51 (3rd Cir. 1966); Dobbins v. Local 212, International Bro. of Elec. Wkrs., 292 F.Supp. 413 (S.D. Ohio 1968); Quarles v. Philip Morris, Incorporated, 279 F.Supp. 505 (E.D.Va. 1968). Contra, Griggs v. Duke Power Company, 292 F.Supp. 243 (M.D.N.C. 1968); U. S. v. International Brotherhood of Electrical Workers, Local 39, 71 L.R.R.M. 2087 (1969); U. S. v. International Brotherhood of Electrical Workers, Local 38, 70 L.R.R.M. 3019 (1969). TheDobbins Court, at 445, said:
 "A policy of giving priority in work referral to persons who have experience under the Local's Collective Bargaining Agreement is discriminatory when competent [Negroes] have previously been denied the opportunity to work under the referral agreement by reason of their race. * * *."
 
 
 [16]
 We recognize that the employers with whom the Locals have collective bargaining agreements are not parties to this lawsuit and that the employers' agreement will be necessary if modification to the collective bargaining agreements is to be made. See, Note, Title VII, Seniority Discrimination and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1280, n. 97 (1967). In the light of this record, we assume that an agreement with the employers, which will meet the conditions laid by this opinion, can be met. If no new agreement is possible, the union must nonetheless discontinue those practices which have been found to be in violation of Title VII by this Court
 
 
 [17]
 The decree in Dobbins v. Local 212, International Bro. of Elec. Wkrs., 292 F.Supp. at 453, stated:
 "* * * The referral system will also hammer out objectively the method by which the U[nion] will determine whether an individual is qualified for referral at all. For example, `a minimum of two years, and based on the individual's own statement.' It will be objective and will expressly deal out the `prerogative' system now in effect. While the U[nion] is the initial judge of a `qualified employee' (29 U.S.C. § 158) it must judge by objective standards. The eventual real test is the ability to work in the normal middle `run of the mine' job for a union contractor. * * *"
 
 
 [18]
 In Local 53 of Int. Ass'n of Heat & Frost I.&A. Wkrs. v. Vogler, 407 F.2d at 1051-1052, the Court stated:
 "Section 703(c) and (d) of the Act, 42 U.S.C.A. § 2000e-2(c) and (d), declares that it is an unlawful employment practice for a labor organization within the purview of the Act to discriminate on the basis of race or national origin in membership, employment referrals or training programs, and section 706(g), 42 U.S.C.A. § 2000e-5(g), authorizes appropriate judicial relief from unlawful discriminatory practices. In formulating relief from such practices the courts are not limited to simply parroting the Act's prohibitions but are permitted, if not required, to `order such affirmative action as may be appropriate.' * * *" (Emphasis added. Footnotes omitted.)
 See also, Morse, The Scope of Judicial Relief Under Title VII of the Civil Rights Act of 1964, 46 Tex.L.Rev. 516, 528-531 (1968).
 
 
 [19]
 See, Hickey, Governmental Regulation of Union Racial Policies, 7 B.C.Ind. & Com.L.Rev. 221-222 (1966); CCH Employment Prac. Guide, § 8032, at 6051 (1969)
 
 
 [20]
 Section 703(h) of the Act provides:
 "(h) Notwithstanding any other provision of this title, it shall not be an unlawful employment practice for an employer to apply * * * different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, * * *, provided that such differences are not the result of an intention to discriminate because of race, [or] color, * * *"
 The trial court found that the referral systems were seniority systems and that there was no evidence that "either defendant * * * intended to, or * * * actually did, discriminate among referents on the basis of race or color." It concluded that there was no basis for destroying the seniority obtained under the systems.
 The referral systems do establish a form of seniority. The trial court's finding that the referral systems did not discriminate on the basis of race or color is, however, without support in the record. The discrimination was, in fact, total. As such, they were not bona fide seniority systems entitled to protection under the Act. See, Local 189, United Papermakers and Paperworkers, AFL-CIO, United Papermakers, AFL-CIO, CLC; and Crown Zellerbach Corporation v. United States of America, supra at 987, 988; Quarles v. Philip Morris, Incorporated, supra 279 F.Supp. at 505-517.
 Note, Title VII, Seniority Discrimination and the Incumbent Negro, 80 Harv. L.Rev. at 1272, stated:
 "* * * It has been suggested that [§ 703(h)], read in light of the senate debate, reflects a congressional consensus favoring the protection of all seniority rights existing before Title VII's effective date. Senator Dirksen never explained what his proviso was intended to mean; Senator Humphrey felt that it clarified the `present intent and effect' of Title VII without narrowing its application. But, however one reads the Dirksen proviso, it does not seem possible to interpret it as providing a blanket exemption for all differences in treatment resulting from seniority arrangements set up before Title VII came into force. The proviso does not expressly refer to such preexisting systems, but to all `bona fide' systems. * * *"
 We also note that in a memorandum by Senators Clark and Case, the floor managers of the bill in the Senate, the Senators pointed out that whereas Title VII might not have the effect of requiring the displacement of incumbent white employees, even where the incumbent work force was restricted to whites, it does prohibit the use of referral lists for future employment compiled on a discriminatory basis:
 "* * * where waiting lists for employment or training are prior to the effective date of the Title, maintained on a discriminatory basis, the use of such lists after the Title takes effect may be held an unlawful subterfuge to accomplish discrimination."
 
 
 [110]
 CONG.REC. 6992, read into the Record on April 8, 1964: Local Lodge No. 1424, Internat. Machinists v. N.L.R.B., 362 U.S. 411, 415, 80 S.Ct. 822, 4 L.Ed. 2d 832 (1960)
 
 
 [21]
 Section 707(a)(3) of the Act provides: "(a) Whenever the Attorney General has reasonable cause to believe that any * * * [labor organization] is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this title, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint
 * * * * *
 "(3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described."