Linda ELDREDGE and Christine A. Mazur, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

CARPENTERS 46 NORTHERN CALIFORNIA COUNTIES JOINT APPRENTICESHIP AND TRAINING COMMITTEE, Defendant.

No. C–75–2062–CBR.

United States District Court, N. D. California.

Nov. 3, 1977.

Melvin K. Dayley, Alberta M. Blumin, Dayley & Blumin, Oakland, Cal., Joan Messing Graff, Equal Rights Advocates, Inc., San Francisco, Cal., for plaintiffs.

Stephen A. McKae, Moore, Sizoo & Cantwell, Oakland, Cal., for defendant.

### AMENDED MEMORANDUM OF OPINION

RENFREW, District Judge.

Plaintiffs Linda Eldredge and Christine A. Mazur filed this sex discrimination action on September 30, 1975. The complaint alleged that the defendant Carpenters 46 Northern California Counties Joint Apprenticeship and Training Committee ("JATC") had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(d), by denying female applicants equal opportunity for placement on the new applicant referral lists used to supply names to union dispatchers for referral of applicants to jobs as beginning apprentices. Plaintiffs sought preliminary relief; certification of a class composed of all women who applied to the

JATC for placement on those lists between August 18th and 29th, 1975;[1] orders requiring the JATC to place and refer applicants in the order in which they apply and to establish an affirmative action program for women; damages including back pay; and costs of suit.

Plaintiffs' motion for a temporary restraining order was denied on October 3, 1975. Although the Court simultaneously ordered the defendant to show cause why a preliminary injunction should not issue, a hearing on that order was withdrawn from the calendar pursuant to a stipulation and order on December 30, 1975. On July 16, 1976, defendant noticed a motion to dismiss the action or for summary judgment; on August 26, 1976, plaintiffs moved to amend their complaint, for class certification, and for summary judgment. Each of these motions was extensively briefed by both parties, and oral arguments were heard on September 16, 1976. On September 30th, plaintiffs' motion to amend the complaint was granted, and an amended complaint was filed February 10, 1977. The principal effects of the amendment were to delete the prayer for damages and preliminary relief, and to add new allegations of discrimination. In addition to the alleged discrimination in placement on referral lists, plaintiffs now allege that defendant's system for referring new applicants to the jobs necessary for admission into apprenticeship, under which the vast majority of new applicants are referred not in numerical order off lists but as they are requested by name by contractor-employers, is itself discriminatory in effect. Since the amended complaint alleges that illegal effects result from the operation of a system in which parties not before the Court are intimately involved, the Court on February 10, 1977, requested the submission of further factual information and briefing relating to defendant's suggestion that employers and labor unions in the Northern California carpentry trade are indispensable parties to the action. (Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, filed September 9, 1976, at 6–7.) Defendant filed a memorandum on this point on March 18, 1977, to which plaintiffs responded on May 9th.

The issues presently before the Court are (1) whether the action must be dismissed for failure to exhaust state and administrative remedies; (2) whether all necessary parties as defined by Rule 19, Fed.R.Civ.P., are presently before the Court; (3) whether class certification is appropriate; and (4) the cross motions for summary judgment. For the reasons set forth below, the Court concludes that plaintiffs have exhausted their remedies within the meaning of Title VII, but that the affected employers and unions must be joined prior to any further disposition of the case.

## I. *FACTUAL BACKGROUND*

Defendant JATC is a joint labor-management committee composed of equal numbers of employer and employee representatives. The committee serves as board of trustees responsible for the administration of the Carpenters Apprenticeship and Training Trust Fund for Northern California ("Fund"), which was created by a 1963 agreement ("trust fund agreement") among representatives of various local unions of the United Brotherhood of Carpenters and Joiners of America (AFL–CIO) and various associations of contractors who employ carpenters in Northern California. The agreement grants the defendant, as board of trustees, "the power and duty * * * to establish, support or maintain programs * * * for the purpose of educating and training persons as journeymen or apprentices" in all classifications covered by any collective bargaining agreement requiring

---

1. Plaintiffs have not amended the complaint to allege any larger class. However, they state in their Memorandum in Support of Plaintiffs' Motion to Certify Action as a Class Action, filed August 26, 1976, at 1, that the class is to include all women who were discriminatorily denied admission to defendant's apprenticeship

employer contributions to the Fund.[2] To meet this obligation, defendant has developed a set of apprenticeship standards and established a four-year apprenticeship program leading to journeyman status upon the completion of a specified number of hours of classroom training and on-the-job experience. The procedures for selecting among applicants to enter this program are the subject matter of this suit.

No selection procedures are specified in either the trust fund agreement or the relevant collective bargaining agreements. Authority to establish such procedures in each of 43 local regions has been delegated to separate local Joint Apprenticeship and Training Committees ("local JATC's"). However, those local bodies are required to operate within the framework of policies adopted by the defendant, and most administrative tasks are performed by defendant's ten District Offices. Until 1974, procedures varied from region to region, but in that year defendant instituted a program imposing uniform selection procedures designed to bring all 46 counties governed by the trust fund agreement into compliance with provisions of state and federal law requiring joint apprenticeship committees to adopt affirmative action plans to increase the number of minorities in the trade.[3] The new procedures were embodied in "Annex C–1," an Equal Opportunity Addendum to the Carpenters 46 Northern California Counties Apprenticeship Standards,

and were approved by the California Administrator of Apprenticeship. Local JATC's operated according to Annex C–1 until November 18, 1976, when the Santa Clara County Federation of Joint Apprenticeship and Training Committees obtained state approval of an "amended C–1." The majority of local JATC's have subsequently shifted to the amended C–1 upon findings by the Administrator of Apprenticeship that they have met their quotas for minorities. However, a few are still operating under the original Annex C–1.

Under both the original and the amended Annex C–1, the qualifications and requirements for admission to apprenticeship are the same: to be qualified, an applicant must be at least 17 years of age and have a high school diploma, G.E.D., or equivalent; to gain admission, he must obtain a position on a new applicant referral list maintained by a local JATC and a referral slip from a local union dispatching him to a job as a beginning apprentice. Once an applicant has satisfied both the listing and the job requirements, he may sign an apprenticeship agreement at one of defendant's district offices, join the union local, and attain the status of "registered" or "indentured" apprentice eligible for classroom training under JATC auspices. All subsequent job referrals for registered apprentices are handled exclusively by the union locals pursuant to collective bargaining agreements. JATC participation in such procedures is

---

and training program at any time since August of 1973.

**2.** The Northern California carpentry trade is governed by two master agreements which are identical in all respects relevant to this action. Carpenters Master Agreement and Hiring Procedures between the Northern California Home Builders Conference *et al.* and the Carpenters 46 Northern Counties Conference Board, Exhibit 11 to the deposition of Charles F. Hanna, filed August 26, 1976; Carpenters' Master Agreement (1974–1977) between the Associated General Contractors of California, Inc., *et al.* and the United Brotherhood of Carpenters and Joiners of America, Exhibit 12 to the deposition of Charles F. Hanna, *supra* ("Master Agreements"). Individual employers neither participate in negotiations nor sign these agreements. Instead, they sign brief Memorandum Agree-

ments by which they agree to comply with a master agreement, to contribute to various trust funds, including the apprenticeship and training trust fund, in the amounts specified in the master agreement, and to be bound by all obligations imposed by the corresponding trust fund agreements.

**3.** *See* Secretary of Labor, Regulations on Equal Employment Opportunity in Apprenticeship Training, 29 C.F.R. Part 30 (1976); Cal.Labor Code §§ 3070 *et seq.* and 3076 (West Supp. 1977); Cal.Adm.Code T. 8, Part 1, Ch. 2, §§ 200 *et seq.* Although California law was recently amended to require joint apprenticeship committees to set goals for women, the precise requirements and enforcement procedures of those new provisions are as yet unclear. Neither party relies on state law in this action.

limited to the referral of new applicants to their first jobs.

The original Annex C–1 provides for a "closed list" system of first referrals. Only applicants listed on an existing new applicant referral list are eligible for referral, and placement on that list may only be obtained during limited open periods selected by the local JATC's. Forty-five days prior to a scheduled opening, the local JATC sends announcements to news media, schools, employment services, outreach programs, and others specifying the date and time of the opening, the duration of the open period, and the procedure for applying. At the specified time, applicants line up at the designated District Office and are given appointments to return and sign, in the order in which they appeared, the "applicant register" for the local JATC from which they desire to be referred. The names of those who are qualified are placed on the new applicant referral list in that order up to a maximum of one and one-half times the estimated number of persons to be referred during the referral period. The list is reviewed by a district coordinator for compliance with affirmative action goals, posted, and distributed to local union dispatchers. Applicants named thereon remain in the pool of those eligible for referral for two years, and may be referred in two ways. First, each applicant is given a letter of subscription or "hunting license," which he may use to seek employment on his own. When he finds a contractor willing to employ him as a registered apprentice for at least sixty days, that employer's signature on the letter will upon presentation to the union dispatcher entitle the applicant to a referral slip. Second, an applicant may await placement off the new applicant referral list simply by keeping the JATC apprised of a telephone number where he can be reached within 24 hours. When an employer calls the union dispatcher and requests a beginning apprentice without specifying any particular individual, the dispatcher obtains from the JATC District Office the name of the first ranking applicant in numerical order on the list and issues a referral slip for that person. After receiving a referral slip by either method, the applicant is indentured.

Although the original C–1 provided considerable room for employer judgment in the selection of new apprentices, it generated dissatisfaction among employers because it restricted the use of the hunting license and thus the potential apprentices available for hire to those named on an established list. This objection provided the impetus for adoption of the amended C–1, which establishes an "open list" or "unrestricted hunting license" procedure. An applicant must still obtain a position on the new applicant referral list prior to indenture, but he may do so at any time and regardless of the number of applicants already on the list. Thus, any individual, whether or not listed with the JATC in advance, may obtain a letter of subscription signed by an employer, place his name on the applicant register, enter into an apprenticeship agreement, and be dispatched to work as a registered apprentice forthwith. The only significance of the list under this system is that the rare employer who calls in for a beginning apprentice without naming an individual will receive the applicant highest in numerical order on that list. It is not disputed that employers are reluctant to hire new apprentices by this method, sight unseen. Of 288 new applicants referred to jobs from the implementation of Annex C–1 until June of 1976, only six, or two per cent, obtained jobs in this way.

Plaintiffs were not aware until mid-1976 of the near futility of awaiting numerical referral off the new applicant referral lists. Believing high placement on the list to be crucial to entry into defendant's program, each plaintiff lined up outside a JATC District Office at midnight on August 17, 1975, nine hours before the scheduled opening for applications. Ms. Eldredge thereby obtained the eighth position in line outside the District 5 (San Francisco) Office and Ms. Mazur obtained the eighth position outside the District 8 (Martinez) Office. Ms. Eldredge and Ms. Mazur did subsequently receive the corresponding eighth positions on local JATC new applicant referral lists at

San Francisco and Martinez, respectively. However, each plaintiff alleges that she encountered an "atmosphere of discrimination that was hostile and discouraging to women" during the application process.

Specifically, Ms. Eldredge states that the first person in line at San Francisco, a woman, was originally given the number two appointment slip to return and sign the applicant register. The error was corrected at the request of the woman, but when she returned to sign, she did so over a long strip of white tape which had been placed over the number one spot. Ms. Eldredge further alleges that Percy Long, Apprenticeship Coordinator for District 5, was evasive in answering her questions as to how applicants were placed on new applicant referral lists and how they would be referred to jobs.

Ms. Mazur states that she applied at the Martinez District Office specifically in order to obtain referrals for the Richmond area, where she understood new apprentices were in greater demand, and that she was deprived of the opportunity to sign the Richmond register when District 8 personnel failed to inform her and other women in line that two separate sets of numbered appointment slips were being distributed: one for applicants who wished to sign the Martinez local JATC applicant register, and the other for those who wished to sign the Richmond local register. Arlis Paslay, Supervisor of the District 8 Apprenticeship Program, announced to those in line that anyone from the Richmond, El Sobrante, or San Pablo area should obtain appointment slips from his secretary while those from Eastern Contra Costa County should do so from him. Although Ms. Mazur heard the announcement, she attached no significance to it in light of her Oakland residence, and as a result obtained the number eight appointment slip for Martinez from Mr. Paslay. When she returned to sign the register, she learned for the first time of the Richmond register but was told she could not sign until after all those with Richmond appointment slips had done so. Because two men who were behind Ms. Mazur in line and who similarly were unaware of the existence of two sets of slips were permitted to sign the Richmond register in fourth and fifth positions, plaintiff feels there has been differential treatment on the basis of sex. However, neither man remembers clearly how he came to sign the Richmond register, and both are residents of San Pablo. Deposition of Joe A. Silveira, filed Feb. 24, 1976, at 6, 14–21; Deposition of Victor Louro, filed Feb. 24, 1976, at 6, 13–17. There is no evidence to suggest that either obtained his position on the Richmond register by anything but routine application of the procedure described by Mr. Paslay.

On or about September 2, 1975, each plaintiff filed formal charges with the Equal Employment Opportunity Commission ("EEOC") alleging that she had suffered discrimination in attempting to obtain a position on defendant's new applicant referral lists. The EEOC on September 8th referred the charges to the California Fair Employment Practices Commission ("FEPC"), as required by 42 U.S.C. § 2000e–5(c), with the recommendation that the case was appropriate for immediate preliminary injunction.[4] By notification of September 11, 1975, the FEPC replied that it would not process the charges in light of the EEOC recommendation, and on September 29th the EEOC issued right-to-sue letters to both plaintiffs on the ground that it would not be able to investigate, conciliate or file suit within 180 days. Upon receipt of those letters, plaintiffs filed this action.

Despite the alleged discrimination, both plaintiffs had fulfilled the first requirement for admission to apprenticeship when their names were placed on new applicant referral lists. Accordingly, they were eligible for job referrals pursuant to the original Annex C–1 then in effect. Each attended an orientation meeting in late September,

---

4. *See* Notice of Deferral Transmittal, dated 8 Sept. 1975, attached as Exhibit D to defendant's Memorandum in Support of Defendant's Motion to Dismiss, etc., filed July 16, 1976.

Although the EEOC request does not itself appear on this form, the FEPC response cites that request as the reason for the state's failure to process the claim.

1975, at which she was informed of the two alternative methods of obtaining a referral, but because each believed it was unlikely she could convince a contractor to request a woman by name, neither initially used her "hunting license" to seek employment on her own. Although each plaintiff continuously maintained a current telephone number in the hope of receiving a numerical referral, neither has been dispatched by that method. In August, 1976, after Ms. Mazur had received a letter from the Martinez JATC stating that many applicants were finding jobs on their own, after defendant had moved for summary judgment in this action, and after discovery had revealed the unlikelihood of numerical referral, both plaintiffs unsuccessfully attempted to find jobs by contacting contractors. At the same time, they sought to amend their complaint to allege that defendant's maintenance of the "hunting license" system as an alternative method of securing job referrals itself violates Title VII.

As of May, 1976, defendant's records show 3,220 registered apprentices, only 13 of whom are women.[5] Of the approximately 1700 persons who obtained positions on new applicant referral lists when applications were opened in August 1975, 92 are women, but as of May, 1976, only four, or four percent of the women on those lists had been dispatched to jobs while 398, or 25 percent of the men had been dispatched. Plaintiffs now contend that this low representation of women is the result of the establishment and maintenance by defendant of the "hunting license" system, ostensibly as an alternative method of obtaining the first job referral necessary for admission, but in fact knowing that because of employer preference, it is the nearly exclusive method. They have submitted the affidavits of three female apprentices and one female applicant, as well as a letter signed by twelve female apprentices, describing the employer discrimination against women which, they allege, operates through the hunting license system to exclude women from apprenticeship. The act of discrimination complained of on this theory is thus the defendant's use of a system that passes the decision as to who may enter the program to others who are known to discriminate against women.

Although plaintiffs continue to complain of discriminatory practices in the placement of women on new applicant referral lists, the relative insignificance of placement on those lists as long as the hunting license system remains available suggests that any relief directed to such practices alone would in no way enhance the ability of women to gain admission to defendant's program.[6] Such relief would be appropriate only if the JATC were first ordered to abolish the hunting license system and to institute a new system for referring applicants to employment, eliminating the present discretion of employers to select new apprentices from those who apply to them. Plaintiffs have not specified the precise system they seek to have instituted, but it is plain that they envision a system requiring an employer who wishes to hire a beginning apprentice to contact the union local and enter a request without naming any individual, whereupon the union would be required to dispatch an applicant selected by the JATC by means of one of a number of non-discriminatory techniques.[7]

5. In a subsequent affidavit, Charles F. Hanna states that 25 women are currently enrolled as apprentices. Affidavit of Charles F. Hanna, filed March 10, 1977, at 11. However, no complete statistics later than those of May, 1976, are presently before the Court.

6. Even Ms. Mazur, who seeks an order granting her and others similarly situated their "rightful places" on the Richmond new applicant referral list, has failed to show that she would have been referred to a job if she had been given a place on that list rather than the Martinez list.

7. Possibilities include the hiring hall system currently used for referral of journeymen to jobs; selection on the basis of the rank order of scores of applicants on one or more qualification standards; random selection from a pool of eligible applicants; selection on an equal basis from separate lists established for minorities, women, and all others; and random or numerical selection from a pool of eligibles chosen by a system guaranteeing population

## II. *EXHAUSTION OF REMEDIES*

Title VII provides an independent basis for federal jurisdiction over actions pursuant to its terms. 42 U.S.C. § 2000e–5(f)(3). Prior to seeking judicial relief, however, plaintiffs must exhaust both state and administrative remedies. Specifically, section 2000e–5(c) requires that they first file charges with the state agency, if any, charged with authority to enforce state employment discrimination laws, and await state action for sixty days unless proceedings are earlier terminated; and section 2000e–5(f)(1) requires that they file timely charges with the EEOC, defer filing suit for 180 days after those charges are filed, and obtain a right-to-sue letter from the EEOC. Defendant argues that plaintiffs have not satisfied the state exhaustion requirement and that the action must accordingly be dismissed. This contention is without merit.

 Even where the deferral requirement is not satisfied, dismissal is unnecessary; the proper course is to retain jurisdiction while plaintiffs seek redress from the state agency. *Waters v. Heublein, Inc.*, 547 F.2d 466, 468 (9 Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977); *Equal Employment Opportunity Commission v. Wah Chang Albany Corp.*, 499 F.2d 187, 189 n.3 (9 Cir. 1974). That procedure is unnecessary in this case, however, since it is well settled that section 2000e–5(c) is satisfied by the procedure followed here: initial reference of the matter to the state agency by the EEOC, followed by notification from the state agency that it will take no action. *Love v. Pullman Co.*, 404 U.S. 522, 525, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972); *Motorola, Inc. v. Equal Employment Opportunity Commission*, 460 F.2d 1245, 1246 (9 Cir. 1972). Defendant contends that the FEPC's decision not to pursue the matter was improper under California law in that no reference was made to the Administrator of Apprenticeship and no hearing was provided. Regardless of the

merits of this contention, *see* Cal.Labor Code § 3096 (West Supp.1977), violations of state law in the treatment of a claim do not offend the deferral rule: federal policy requires only that the state be afforded an opportunity to take the case. *Pacific Maritime Ass'n v. Quinn*, 465 F.2d 108, 110–111 (9 Cir. 1972). Finally, plaintiff's failure to allege deferral in their pleadings is of no significance, since no such allegations are required by Rule 8(a)(1), Fed.R.Civ.P. *Equal Employment Opportunity Commission v. Wah Chang Albany Corp., supra*, 499 F.2d at 189.

 A more difficult question is posed by plaintiffs' undisputed failure to wait 180 days after the EEOC's assumption of jurisdiction before filing suit, as required by section 2000e–5(f)(1). There is a sharp division in the authorities as to whether this requirement is jurisdictional. *Compare Budreck v. Crocker National Bank*, 407 F.Supp. 635 (N.D.Cal.1976), and *Jones v. Pacific Intermountain Express*, 10 F.E.P. Cases 914 (N.D.Cal.1976), *with Lewis v. FMC Corp.*, 11 F.E.P. Cases 31 (N.D.Cal. 1975), and *Howard v. Mercantile Commerce Trust Co.*, 10 F.E.P. Cases 158 (E.D.Mo. 1974). For the reasons stated in *Budreck, supra*, the Court adheres to the view that compliance with the statutory waiting period is ordinarily a prerequisite to the assumption of jurisdiction. Plaintiffs apparently believe that their prayer for a temporary restraining order and a preliminary injunction made compliance with the statutory period unnecessary for all purposes. Memorandum of Law in Response to Defendant's Motion to Dismiss and for Summary Judgment, filed August 26, 1976, at 23–24. Such a *per se* rule cannot be supported. However, in the circumstances of this case the Court agrees that jurisdiction was properly assumed to entertain those motions, and that the passage of 180 days prior to hearing on a motion to dismiss cured the jurisdictional defect that would otherwise have required dismissal of the action for permanent relief.

---

parity. Affidavit of B. J. Miller in Support of Plaintiffs' Statement of Position, filed May 16, 1977; Plaintiffs' Memorandum in Support of

Plaintiffs' Motion for Summary Judgment, filed August 26, 1976, at 7–8.

At plaintiffs' request, the EEOC issued right-to-sue letters only 18 days after receipt of the case from the FEPC, and this action was filed the following day. The result of this procedure was to foreclose any possibility of conciliation—either formal or informal—prior to the hardening of positions and narrowing of issues that inevitably follow the assumption of roles as adversary parties in a judicial proceeding, impairing further efforts at voluntary settlement. *See Johnson v. Railway Express Agency*, 421 U.S. 454, 461, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Budreck v. Crocker National Bank, supra*, 407 F.Supp. at 643–644. In the ordinary case, such short-circuiting of the time periods contemplated by the statute frustrates the intention of Congress to promote conciliation and voluntary settlement. Yet Congress itself recognized, by enacting a provision authorizing the EEOC to seek preliminary relief, 42 U.S.C. § 2000e–5(f)(2), that the interest in enforcement may outweigh the policy favoring nonjudicial settlement when an aggrieved person is threatened with irreparable injury that imperils the adequacy of any final relief. Congress failed to similarly provide for private litigants, however, and their efforts to invoke the jurisdiction of federal courts on motions for preliminary relief pending administrative disposition of the underlying charges have met with mixed success.[8] The conflicting results derive from the courts' efforts to accommodate two competing concerns: first, that it would be unfair and unrealistic to require exhaustion where rights are threatened with irreparable harm, a failure to act may permanently foreclose adequate relief, and the EEOC's caseload precludes it from seeking preliminary relief, *see Bowe v. Colgate Palmolive Co.*, 272 F.Supp. 332, 338 (S.D. Ind.1967), *aff'd in part and rev'd in part*, 416 F.2d 711 (7 Cir. 1969); *Drew v. Liberty Mutual Insurance Company*, 480 F.2d 69, 73–74 (5 Cir. 1973), *cert. denied*, 417 U.S. 935, 94 S.Ct. 2650, 41 L.Ed.2d 239 (1974); and second, that to permit individuals to bypass the statutory mechanism in cases where the EEOC does not seek prompt judicial relief would flood the courts with such requests, *see Collins v. Southwestern Bell Telephone Co.*, 376 F.Supp. 979 (E.D.Okl. 1974).[9]

Although the issue is currently before the United States Supreme Court, the law of this Circuit at the present time is that in a "limited class of cases" where there exists a high probability of success on the merits and the threat of irreparable harm, a court may entertain a suit to maintain the status quo pending administrative

**8.** For the view that courts have jurisdiction to hear claims for preliminary relief despite the failure to exhaust administrative remedies, *see, e. g., Drew v. Liberty Mutual Insurance Company*, 480 F.2d 69 (5 Cir. 1973), *cert. denied*, 417 U.S. 935, 94 S.Ct. 2650, 41 L.Ed.2d 239 (1974); *Parks v. Dunlop*, 517 F.2d 785 (5 Cir. 1975); *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 425 F.Supp. 318 (D.Mass.), *aff'd*, 545 F.2d 222 (1 Cir. 1976). For the opposing view, *see, e. g., Nottelson v. A. O. Smith Corp.*, 397 F.Supp. 928 (E.D.Wis. 1975); *Troy v. Shell Oil Co.*, 378 F.Supp. 1042 (E.D.Mich.1974), *appeal dismissed as moot*, 519 F.2d 403 (6 Cir. 1975); *Collins v. Southwestern Bell Telephone Co.*, 376 F.Supp. 979 (E.D.Okl. 1974).

Other courts have blurred the distinction between jurisdiction and the availability of preliminary relief, and appear to hold that jurisdiction may be available only in cases where relief on the merits is appropriate, *see Berg v. Richmond Unified School District*, 528 F.2d 1208, 1211 (9 Cir. 1975), *cert. granted*, 429 U.S. 1071, 97 S.Ct. 806, 50 L.Ed.2d 788 (1977); *Jerome v.*

*Viviano Food Co., Inc.*, 489 F.2d 965, 966 (6 Cir. 1974) (holding no irreparable harm and thus no jurisdiction where no existing employee-employer relationship); *Donald v. Ray*, 377 F.Supp. 986, 987 (E.D.Tenn.1974); or only where the circumstances particularly demand such relief, *Townsend v. Exxon Co.*, 420 F.Supp. 189, 193 (D.Mass.1976) (retaliatory discharge).

**9.** A third concern occasionally mentioned is that without jurisdiction over the underlying cause of action, a court is precluded from providing relief of any sort. *Troy v. Shell Oil Co., supra*, 378 F.Supp. at 1048; *Nottelson v. A. O. Smith Corp., supra*, 397 F.Supp. at 933. This concern seems unfounded, however, in view of the principle established in other areas of administrative law that a court has power to preserve the status quo by staying private action pending an administrative decision. *See Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964*, 84 Harv.L.Rev. 1109, 1257 (1971).

disposition. *Berg v. Richmond Unified School District*, 528 F.2d 1208, 1211 (9 Cir. 1975), *cert. granted*, 429 U.S. 1071, 97 S.Ct. 806, 50 L.Ed.2d 788 (1977). Although the facts of this case depart from the *Berg* rule in at least three respects, none of those differences calls for a change in the result. First, since the motion for a preliminary injunction was withdrawn from the calendar, the Court has made no findings on the merits. Nevertheless, the EEOC's evaluation of the case as one appropriate for immediate preliminary injunction would appear to satisfy the threshold test that there be some substance to the claim. To permit suits only where such a determination is made need not lead to any flood of litigation. Second, plaintiffs' motions went beyond merely "maintaining the status quo," since plaintiffs were not employees seeking relief from threatened changes in the employment relationship, but applicants for admission to defendant's program. A few courts have drawn a distinction on this basis, *see* footnote 8, *supra*, but differential treatment is not justified by the policies involved: if a preliminary injunction is otherwise appropriate, it makes no difference to the injured plaintiff or to the enforcement of Title VII that the injury is to be imposed by inaction rather than by action. Finally, plaintiffs arguably sought more than interim relief pending administrative disposition, since the EEOC had prematurely issued its final right-to-sue letter, thus terminating the administrative phase. *See EEOC v. Pacific Press Publishing Association*, 535 F.2d 1182, 1186 (9 Cir. 1976). However, the EEOC had certified that it would be unable to reach the case within the 180-day period. Thus, no administrative disposition was to be anticipated. Moreover, the prospects of informal settlement are unlikely to have been impaired by the initiation of the suit for permanent relief to any greater extent than they would already have been impaired by the filing of the motion for a preliminary injunction. To hold that the action was barred by an EEOC error having no effect on statutory policy would indeed be pointless. Had the parties known that the 180-day period would be interpreted as jurisdictional, they could have limited their initial prayer to preliminary relief, waited 180 days, obtained a right-to-sue letter, and sought permanent relief, all without any significant substantive effect.

 Although the Court thus concludes that jurisdiction was properly taken over the claims for preliminary relief, this conclusion does not in itself justify the assumption of jurisdiction over the underlying claim. That jurisdiction can only be justified if the lapse of 180 days between the EEOC's assumption of jurisdiction and the hearing on a motion to dismiss can cure the initial failure to meet that jurisdictional requirement. It is settled that subsequent receipt of a right-to-sue letter can cure the jurisdiction in a suit initially filed without one, *Berg v. Richmond Unified School District, supra*, 528 F.2d at 1212, but the differing policies involved make it less clear that the mere passage of time, absent a dismissal and a refiling with the EEOC, should ordinarily be permitted to cure the jurisdictional defect of premature filing. *Compare Budreck v. Crocker National Bank, supra*, 407 F.Supp. at 647 n.19, *with Berg v. LaCrosse Cooler Co.*, 548 F.2d 211, 213 (7 Cir. 1977), and *Troy v. Shell Oil Co.*, 519 F.2d 403 (6 Cir. 1975). Where the parties were properly before the Court in the first instance on motions for preliminary relief, however, the Court concludes that no policy would be served by a dismissal. The only departure from proper procedures was the premature issuance of the right-to-sue letter and the resulting premature filing of a complaint for permanent relief. To dismiss now would not deter other litigants from seeking judicial action in circumstances where preliminary relief may be appropriate, and thus would not serve the policy of promoting informal settlement prior to the onset of litigation. It would no doubt discourage the EEOC from divesting itself of claims prematurely, and thus would serve the congressional purpose of providing ample opportunity for administrative action. Where the backlog of cases prevents an administrative disposition in any case, how-

ever, this result has insufficient practical impact to justify the imposition of hardship in a particular case.

## III. *RULE 19*

 It is no doubt true, as plaintiffs argue, that a joint apprenticeship committee cannot avoid liability under Title VII by delegating the responsibility for screening applicants to a third party. *See Crockett v. Green,* 388 F.Supp. 912 (E.D.Wis.1975), aff'd 534 F.2d 715 (7 Cir. 1976). The relief contemplated in this case, however, will have substantial impact on both the employers who must hire apprentices if they are to receive on-the-job experience and the unions which pursuant to collective bargaining agreement are responsible for the dispatch of all employees to jobs with signatory employers. Rule 19 [10] does not, of course, require joinder of all parties who may be affected by an order. The issues are, first, whether employer or union involvement is of such a nature that without them complete relief cannot be accorded those already parties, Rule 19(a)(1), and second, whether their interests are such that to proceed in their absence may as a practical matter prejudice them or subject the parties already before the Court to a substantial risk of incurring inconsistent obligations, Rule 19(a)(2). If either of these conditions is shown, Rule 19(a) requires that the absent parties be joined if to do so will

not deprive the Court of jurisdiction over the subject matter. If a party cannot be joined as required, Rule 19(b) calls for a second inquiry to determine whether in equity and good conscience the action should be dismissed.

 Plaintiff's initial contention is that when no relief is sought against absent parties, those parties cannot be regarded as "indispensable." This argument is wholly without merit. By definition, parties to be joined under Rule 19 are those against whom no relief has formally been sought but who are so situated as a practical matter as to impair either the effectiveness of relief or their own or present parties' ability to protect their interests. The cases cited by plaintiffs are not to the contrary. Each merely lists the failure to seek relief against the absent parties as one factor in a decision that joinder was not required, in cases where no involvement or participation by those parties in the challenged discriminatory practices had been alleged. *Hibbler v. Miller's of Birmingham Bankhead Highway, Inc.,* 496 F.2d 1171, 1172 (5 Cir. 1974); *Waters v. Heublein, Inc.,* 11 E.P.D. ¶ 10,620 at 6587 (N.D.Cal.1975), *rev'd on other grounds,* 547 F.2d 466 (9 Cir. 1976), *cert. denied* —— U.S. ——, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977). In contrast, the involvement of both employers and unions in the subject matter of this action is evident on the face of the amended complaint.

---

**10.** Rule 19 provides in part:

"(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would

render the venue of the action improper, he shall be dismissed from the action.

"(b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."

In a similar vein, plaintiffs contend that complete relief can be accorded by an order against the JATC alone, since pursuant to the trust fund agreement it is solely responsible for establishing and maintaining apprenticeship programs, since no particular procedure for selecting apprentices is enshrined in any agreement to which absent parties are signatories, and since it alone selected and can abolish the "hunting license" system, subject to state approval. This argument misconceives the nature of the issues under Rule 19(a)(1). Although the legal position of the present defendant and its theoretical ability to comply with an order are relevant, they may be outweighed by a finding that absent parties may as a practical matter prevent the full realization of the intended relief. The Court must guard against the formulation of " 'paper' decrees which neither adjudicate nor, in the end, protect rights." *Schutten v. Shell Oil Co.*, 421 F.2d 869, 874 (5 Cir. 1970). Thus the contractual rights and duties relied on by plaintiffs are only a starting point for a full consideration of the actual role of each party in the formulation of the practices complained of and the stake each has in maintaining them. *See LeBeau v. Libby-Owens-Ford Co.*, 484 F.2d 798, 800 (7 Cir. 1973).

### A. *The Employers*

Employers are not obligated to hire beginning apprentices by either the master collective bargaining agreements governing the trade [11] or the trust fund agreement itself. They need only employ one apprentice (at any experience level) if five journeymen are employed, and one additional apprentice for each five journeymen thereafter. Master Agreements § 40. When an employer does request a beginning apprentice, he retains the right to reject the individual dispatched "for any reason," Master Agreements § 49(9), subject only to liability for two hours "show-up time" to be paid to the applicant, Master Agreements § 30. No new system of referral adopted by the JATC could either require contractors to employ beginning apprentices, other than those necessary to meet the contractual minimum, or compel those who do so to accept any particular individual. Nor could such an obligation be created by any decree fashioned by this Court in their absence. Employers could refuse to hire beginning apprentices or refuse to hire women when referred without violating the terms of a decree ordering the JATC to adopt a revised referral system. Although such actions could violate an order requiring the implementation of an affirmative action plan to promote the indenturing of women, the employers are not sufficiently "identified * * * in interest" with the JATC to be bound by such a decree as non-party participants under Rule 65(d), Fed.R.Civ.P. *Regal Knitwear Co. v. Board*, 324 U.S. 9, 13–14, 65 S.Ct. 478, 89 L.Ed. 661 (1945); see *Equal Employment Opportunity Commission v. Local Union No. 3, International Union of Operating Engineers*, No. C–71–1277–RFP (N.D.Cal. March 16, 1977).

Employers thus have the ability to defeat any relief ordered in this action in three ways. First they may refuse to hire new apprentices at all, if they do not wish to accept individuals without first interviewing them. Under a revised referral system, the absence of applicants actively seeking to convince employers to hire beginning apprentices may tend to encourage this result. Of course, such action would eventually result in a reduction of the total number of apprentices, and some employers would ultimately be forced to hire new apprentices in order to maintain the apprentice-journeyman ratios specified in the collective bargaining agreements and in the California statute governing projects undertaken pursuant to contracts with state and local government entities. Cal.Labor Code § 1777.5 (West Supp.1977). However, no evidence has been submitted to demonstrate the impact of these limitations on the hiring of new apprentices, in light of the large number of experienced apprentices presently unemployed, the inapplicability of

---

**11.** *See* note 2, *supra.*

the contractual provision to employers using less than five journeymen, and the numerous exemptions created by the statute.

Second, employers may, with the cooperation of union locals, hire unregistered, non-union apprentices, who may obtain sufficient experience and skill to be classified as journeymen and thus be accorded equal treatment at the hiring hall without regard to participation in defendant's program. Such apprentices would not, however, satisfy either the contractual or the statutory obligation to hire apprentices in specified ratios. See Master Agreements § 40; Cal. Labor Code § 1777.5, *supra.* Moreover, under United States Department of Labor regulations all contracts covering federally financed and assisted construction must include a clause requiring nonregistered apprentices to be paid at a rate determined by the Secretary of Labor for the class of work actually performed, rather than the lower rate permitted for registered apprentices. 29 C.F.R. § 5.5(a)(4) (1976). Again, no evidence as to the overall impact of these provisions on the trade is before the Court.

Finally, assuming that these provisions will motivate employers to hire significant numbers of beginning registered apprentices, female applicants may still be rejected at a cost of two hours' pay, which may be estimated from the wage scale effective June 16, 1976, at approximately $21 each.[12] Plaintiffs have submitted substantial evidence which appears to show that it is the employers, not the JATC, who are responsible for the dearth of women in the carpentry trade. There is nothing in the record to indicate that the reasons presently given by employers for rejecting women would not persuade them to continue rejecting them at this slight additional cost.[13] It is not clear whether this tactic would violate any contractual obligation owed to the JATC, but even if it would, there is no suggestion in the record that the JATC has enforcement authority adequate to force recalcitrant employers to accept female applicants.[14]

The record does not reveal whether an applicant who is dispatched and rejected by the employer would become a registered apprentice. Assuming that he would, the ability of employers to reject those dispatched would not impede attainment of plaintiffs' announced goal of entry into defendant's program. It would, however, prevent any meaningful participation in that program, since only schooling, not on-the-job training, would be available to women. Thus, the relief obtained in this lawsuit would serve only to swell the ranks of unemployed apprentices. This surely cannot be the "complete relief" contemplated by Rule 19(a).

It is no answer to these problems to say that plaintiffs seek limited relief in order that women may gradually integrate the trade, and that if future employer discrimination excludes women from the full bene-

---

12. The schedule of wages attached to the Northern California Home Builders Conference Master Agreement, Appendix 7 to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, filed September 9, 1976, shows a wage rate for beginning apprentices of $6.75 per hour and a schedule of contributions for fringe benefits totalling $3.80 per hour, for a total of $21.10 for the two hours of show-up time.

13. Defendant has suggested that the use of a closed list may have motivated local JATC employees to accelerate efforts to indenture minority apprentices in order to return to the free selection system once quotas were attained. This factor would almost certainly be outweighed in this case, however, by the documented reluctance of employers to hire women.

14. Defendant has stated that the JATC has some police authority and can withdraw the use of apprenticeship facilities from employers who hire unindentured apprentices. Memorandum of Points and Authorities RE: Indispensable Parties and the Jurisdiction of the Court, filed March 18, 1977, at 5. No document evidencing this authority is before the Court, and it is unclear whether the JATC could withdraw facilities from employers who do not bypass the referral system entirely but simply refuse to accept certain individuals. Even if this sanction is available, any attempt to impose it would place the JATC in the difficult position of having to prove the illegal motive of discrimination or face liability for refusing to provide services merely because the employer had exercised his contractual right to reject applicants "for any reason." Master Agreements § 49(9).

fits of apprenticeship, such women may seek legal redress against the responsible parties. The plain fact is that the opportunity to gradually integrate the trade exists now to the same extent and subject to the same obstacles as it would under any decree that could be fashioned against the JATC alone. There is no evidence that the change in referral system sought here will have any effect on the apparent source of the discrimination alleged—the absent employers. More women might indeed attain the status "registered apprentice," but to obtain jobs they would have to bring to court precisely the same parties who would be sued in the absence of any decree against the JATC.[15] Although the plaintiffs' motive—to avoid unnecessarily taxing judicial resources—is a laudable one, the Court must conclude that it would be a misuse of those resources to pursue this action to a conclusion in the absence of parties without whom any relief would quite probably be a futile gesture.

None of the authorities cited by plaintiffs supports a contrary result. The Court has been directed to only one case in which relief was afforded against a party which had used a non-party's discriminatory action as the vehicle for its own discrimination. *Crockett v. Green, supra*, 388 F.Supp. 912. There, the City of Milwaukee was ordered to suspend a requirement that skilled tradesmen have completed a formal apprenticeship and a designated amount of journeyman experience prior to hiring, because past union discrimination had prevented blacks from obtaining those qualifications. Since the effectiveness of that relief did not depend in any way on union participation, *Crockett* provides no precedent for the relief sought here. The analogy would be more apt if the City had there

been ordered to require the union to accept more blacks into apprenticeship.

Plaintiff relies on decisions holding that relief may be granted against unions to modify discriminatory job referral systems in the absence of the affected employers. *Kaplan v. Intern. Alliance of Theatrical and Stage Employees and Motion Picture Machine Operators*, 525 F.2d 1354 (9 Cir. 1975); *United States v. Sheet Metal Workers Intern. Ass'n, Local Union No. 36*, 416 F.2d 123, 132 n.16 (8 Cir. 1969); *United Minority Workers v. Intern. Union of Operating Engineers*, 10 E.P.D. ¶ 10,581 (D.Or.1975); *Butler v. Local No. 4 and Local No. 269, Laborers' Intern. Union*, 308 F.Supp. 528 (N.D.Ill.1969). None of these decisions, however, involved allegations of discriminatory conduct by the employers, a fact on which the courts expressly relied in both *Kaplan, supra*, 525 F.2d at 1361, and *United Minority Workers, supra*, 10 E.P.D. at 6402. Where, as in those two cases and in *Butler, supra*, only internal union policies were challenged,[16] there was no reason to fear that the relief would not be complete. A more substantial question was presented in *Sheet Metal Workers, supra*, in that the changes in referral practices ordered by the court required modifications in the collective bargaining agreement and thus were not possible without the cooperation of the employers. In apparent recognition that such relief could not be ordered against the unions alone, the Court of Appeals stated that compliance could be achieved by discontinuing those practices which were found to violate Title VII, presumably by abandoning the referral system altogether. In this case, no such resolution is possible, because the defendant's effective abandonment of its responsibility for referral is

---

15. In fact, a decree establishing a closed list referral system could hamper the process of obtaining relief against discriminating employers. Under the amended Annex C–1, any woman may seek work as a carpenter and file suit against each employer who rejects her because of her sex. Under the type of system sought by plaintiffs, the class of potential plaintiffs who may sue a given discriminating employer will be far more limited.

16. In *Butler v. Local No. 4 and Local No. 269, Laborers' Intern. Union, supra*, the court expressly rejected the union defendants' assertion that plaintiffs sought the creation of a hiring hall, a remedy which would have required the cooperation of non-party employers. Instead, the court found that plaintiffs had alleged the existence of a de facto hiring hall and sought only to end the unions' discriminatory practices within that framework. 308 F.Supp. at 532.

precisely the act complained of, and the underlying job requirement cannot be eliminated without altering the nature of the apprenticeship program itself.

Of more relevance to the instant case are decisions in which courts have found evidence suggesting that the absent party may have been responsible for the alleged discrimination, and have therefore ordered joinder. *Gilmore v. Kansas City Terminal Railway Co.*, 509 F.2d 48, 52–53 (8 Cir. 1975); *Evans v. Sheraton Park Hotel*, 164 U.S.App.D.C. 86, 90, 503 F.2d 177, 181 (1974). *Cf. Wright v. Stone Container Corp.*, 524 F.2d 1058, 1062 (8 Cir. 1975) (doubting adequacy of class representative who failed to join union whose policies contributed to creation of suspect practices); *Equal Employment Opportunity Commission v. Eagle Iron Works*, 8 E.P.D. ¶ 9541, at 5356 (S.D.Iowa 1974) (mere signatory of collective bargaining agreement not indispensable party where no suggestion it has engaged in unlawful practices); *Ostapowicz v. Johnson Bronze Co.*, 369 F.Supp. 522, 531–532 (W.D.Pa.1973), *modified on other grounds*, 541 F.2d 394 (3 Cir. 1976) (union need not be joined where discriminatory effect of collective bargaining agreement is caused solely by employer actions). *See also Haas v. Jefferson National Bank*, 442 F.2d 394, 397–398 (5 Cir. 1971) (absent party who participated in alleged unlawful conversion should be joined). Even where no responsibility for unlawful conduct is alleged, courts have recognized that relief may be ineffective where absent parties are "active participants" without whom a program challenged as discriminatory could not operate. *Spirt v. Teachers Ins. and Annuity Ass'n of America*, 416 F.Supp. 1019, 1022 (S.D.N.Y.1976); *McDonald v. General Mills, Inc.*, 387 F.Supp. 24, 38 (E.D.Cal.1974). In this case, the employers are not only participants in the apprenticeship program but indeed the allegedly principal cause of the discrimination complained of. Plainly here, as in *Evans v. Sheraton Park Hotel, supra*, the Court should decline the invitation to grant "rather ineffective symptomatic relief, leaving the root * * * to continue." 164 U.S.App.D.C. at 90, 503 F.2d at 181.

■ This determination alone is sufficient to require joinder. However, it should be noted that the second factor to be considered under Rule 19(a), the interest of the employers in the subject matter of the action, supports joinder as well. Under the present system employers enjoy the right to select their own beginning apprentices subject only to the requirement that the applicant be listed with the JATC in localities where the original Annex C–1 is in effect. Even where there are no objective qualifications for a job, the interest of an employer in selecting those who, for any non-discriminatory reason, he believes to be more highly motivated or more compatible with his existing work force, is not an insubstantial one. Nor does recognition of that interest require any assumption that women dispatched under a revised system would be less motivated or qualified in any way than men: the employer's interest in selecting an employee of his own choosing would be violated by the dispatch of an undesirable man as much as by that of a similar woman. It is no doubt true that the " 'unstandardized and subjective' " judgments presently being made " 'lend themselves to arbitrary and discriminatory hiring' ", *Waters v. Furnco Construction Corp.*, 551 F.2d 1085, 1089 (7 Cir. 1977), *quoting Reed v. Arlington Hotel Co., Inc.*, 476 F.2d 721, 724 (8 Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973), and plaintiffs have suggested that such results have occurred in this case. Nevertheless, the employers are entitled to their day in court to contest these allegations before the Court issues an order abolishing the prerogatives they presently enjoy.

Plaintiffs maintain that the employers here gave up their ability to protect this interest when they agreed to be bound by the trust agreement and thus delegated to the JATC the authority to establish apprenticeship programs. Although the terms of the instrument are unclear on this point, we may assume that the employers did thereby agree to submit to any referral system adopted by the JATC. Even so, they re-

tained a significant measure of control over the system selected, since they appoint half the members of the JATC and may bargain with the remaining union members. A court order instituting a new referral system will deprive them of this control. Of course, such an order would not wholly eliminate employer freedom to select apprentices, since they are always entitled to reject applicants referred. That freedom would, however, be constrained in two ways: it could be exercised only at the price of showup time; and the pool of applicants would be limited to those referred, one at a time, by the union. Any conceivable decree would thus practically impair the employer's ability to protect a significant interest in selectivity in hiring.

The fact that this interest stems from a collective bargaining agreement does not, as plaintiffs suggest, render it irrelevant for purposes of Rule 19. None of the decisions cited for that proposition establishes any such *per se* rule: each court has examined the circumstances of the case to determine the actual effect of the action on the absent party, and a key consideration has been that the discriminatory conduct alleged is limited to the named defendant. *Waters v. Heublein, Inc., supra,* 11 E.P.D. at 6587; *Rosario v. New York Times Co.,* 10 E.P.D. ¶ 10,450, at 5947 (S.D.N.Y.1975); *Atkinson v. Owens-Illinois, Inc.,* 9 E.P.D. ¶ 10,-155, at 7704 (N.D.Ga.1975); *Equal Employment Opportunity Commission v. Eagle Iron Works, supra,* 8 E.P.D. at 5356; *Ostapowicz v. Johnson Bronze Co., supra,* 369 F.Supp. at 522, 531–532.

█ Nor does the presence of a party who is already defending employer interests to some extent obviate the need for joinder. Though frequently mentioned, this factor has merely been one among many considered in determinations pursuant to Rule 19. *See United States v. Navajo Freight Lines, Inc.,* 525 F.2d 1318, 1322 (9 Cir. 1975) (international and local unions); *United States v. T.I.M.E.–D.C., Inc.,* 517 F.2d 299, 310 (5 Cir. 1975), *vacated on other grounds,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (international and local unions); *United States v. St. Louis-San Francisco Railway Co.,* 52 F.R.D. 276, 280 (E.D.Mo.), *rev'd on other grounds,* 464 F.2d 301 (8 Cir. 1971), *cert. denied,* 409 U.S. 1107, 1116, 93 S.Ct. 900, 34 L.Ed.2d 687 (1973) (union and its members); *United States v. Enterprise Ass'n of Steamfitters,* 360 F.Supp. 979, 995 (S.D.N.Y.1973) (trade association and its members). Here the JATC is a legal entity separate and distinct from the employers and unions which created it. No agency relationship has been alleged, and the JATC's interests are not identified with those of the employers as are those of the entities dealt with in the cases cited above. In fact, the JATC has no independent interest in defending employer selectivity. Here, as in *Grogg v. General Motors Corp.,* 12 E.P.D. ¶ 11, 204 (S.D.N.Y.1976), there simply are not adequate assurances of the unity of the various parties to hold joinder unnecessary on that ground. 12 E.P.D. at 5542.

Finally, decisions rejecting the claim that employers must be joined in suits seeking the elimination of discriminatory union referral practices are inapposite. In each such case the employers had already completely given up their right to selectivity when they agreed to accept those persons dispatched by the union and retained no control over union methods of referral.[17] No case has been found which orders a union or apprenticeship committee to estab-

---

17. In *Kaplan v. Intern. Alliance of Theatrical and Stage Employees and Motion Picture Operators, supra,* 525 F.2d 1354, the Court did to some extent modify procedures for operation of a referral system which were set forth in a collective bargaining agreement, and thus not beyond employer control. However, the order affirmed in Kaplan merely required that the female plaintiff be placed on an existing roster which entitled photographers to preference in hiring, without altering the system of hiring or the degree to which employers were free to select their own employees. The only possible prejudice from the addition of one individual to a pool to which employers had already agreed to give preference was potential lack of qualification, and the evidence indicated that employers considered the plaintiff qualified. 525 F.2d at 1361.

lish a hiring hall or adopt other measures limiting employer selectivity in hiring in the absence of the affected employers.

### B. The Union Locals

█ The role of the union locals in the subject matter of this action is limited to the dispatch of beginning apprentices at the request of employers. Defendant argues that their presence is required by Rule 19(a)(1), because they are in a position to frustrate the effectuation of any relief by simply ignoring new JATC procedures and continuing to dispatch those individuals requested by employers. Although the extent of the unions' contractual obligation to abide by procedures adopted by the JATC is unclear, in practice it appears that the JATC can enforce its selection of new apprentices by refusing to indenture any wrongly dispatched individual. Thus, to the extent that employers desire *registered* apprentices, the unions would be unable to satisfy that demand without complying with the JATC procedures. The relief ordered in this action could be frustrated only to the extent that unregistered apprentices satisfy employer needs.

With respect to Rule 19(a)(2), the unions have an interest in the maintenance of an effective apprenticeship and training program which produces adequate numbers of competent apprentice and journeyman members. If, for the reasons discussed in Part III, A, *supra,* the decree of the Court were to result in either a significant decline in the number of apprentices employed or an increase in unemployment among apprentices, that interest would be significantly impaired.[18] Moreover, on these assumptions the unions would be entitled to demand that the JATC fulfill its obligation under the trust fund agreement to maintain an adequate apprenticeship program. The JATC would then be placed in the untenable position of choosing between two mutually exclusive obligations: to assure the in-

denturing of women pursuant to court order, and to maintain the program as required by contract.

On the present state of the record it is impossible to say with certainty that the relief sought here will reduce the total number of apprentices employed or increase unemployment among apprentices, thus requiring joinder under Rule 19(a)(2), or increase the demand for unregistered apprentices, thus requiring joinder under Rule 19(a)(1). However, in light of plaintiffs' allegations and supporting affidavits to the effect that employer reluctance to hire women is the real source of the discrimination alleged, the Court concludes that employer action leading to one or more of these results is sufficiently likely as to require joinder of the affected union locals.

### IV. JOINDER

Defendant argues that joinder is barred by failure to name the absent parties in charges filed with the EEOC and failure to file suit against those parties within 90 days of receiving notice of right to sue, as required by 42 U.S.C. § 2000e–5(f)(1). Neither of these omissions can prevent joinder in this case.

█ Title VII's policy of encouraging conciliation and voluntary settlement in the first instance has led courts to formulate a rule that parties not named in an EEOC charge are not subject to suit. *Thornton v. East Texas Motor Freight,* 497 F.2d 416, 423 (6 Cir. 1974); *LeBeau v. Libby-Owens Ford Co., supra,* 484 F.2d at 799; *Bowe v. Colgate Palmolive Co.,* 416 F.2d 711, 719 (7 Cir. 1969). This policy-based rule is, however, subject to numerous exceptions in favor of conflicting policies, two of which are relevant here.

█ First, since EEOC charges are frequently filed without legal assistance at an early stage of the proceedings, it would

---

18. Contrary to plaintiffs' assertion, the impairment of union interests goes beyond the mere dissatisfaction of "majority" employees that may be anticipated in any Title VII case. *See Phillips v. Carborundum Co.,* 361 F.Supp. 1016,

1020 (W.D.N.Y.1973). Here, the order may prevent the satisfaction of obligations to all the unions' apprentice members and to the union itself.

frustrate the goals of Title VII to require procedural exactness in stating the charges. *Kaplan v. Intern. Alliance of Theatrical and Stage Employees and Motion Picture Machine Operators, supra,* 525 F.2d at 1359. Thus, charges are to be construed with the utmost liberality, and parties named in the factual statement in sufficiently specific terms to apprise the EEOC of the source of the alleged discrimination may subsequently be joined in judicial proceedings. *Id.; Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 462–463 (5 Cir. 1970). Here, both plaintiffs alleged that they were being denied membership in the "carpenters' union." As respondent, Ms. Eldredge named "Carpenters Local 46, J.A.T.C.," and Ms. Mazur named "Union 46, Carpenters Joint Apprenticeship Training Committee." These statements were plainly sufficient to apprise the EEOC of the unions' involvement in the alleged discrimination and thus to support joinder in this action.

 Second, when application of the procedural bar would prevent joinder pursuant to Rule 19(a), important policies favoring enforcement of Title VII, judicial economy, and the rights of litigants would be frustrated by an inflexible rule. In such cases, considerations of "uniformity * * [and] of the time, effort and expense involved in duplication, with the possibility of inconsistent results" demand that the entire matter be disposed of in one proceeding. *Bremer v. Saint Louis Southwestern Railroad Co.,* 310 F.Supp. 1333, 1340 (E.D.Mo. 1969). Joinder is thus plainly appropriate where no purpose of conciliation could have been served if the parties had been named. *See Equal Employment Opportunity Commission v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086, 1095 (6 Cir. 1974). Several courts have so held in situations where the absent party was not alleged to have been responsible for any discrimination, or would naturally have become involved in any efforts to conciliate. *Grogg v. General Motors Corp., supra,* 12 E.P.D. at 5542; *Equal Employment Opportunity Commission v. Braswell Motor Freight Lines, Inc.,* 8 E.P.D. ¶ 9714 (N.D.Tex.1974); *Equal Employment Opportunity Commission v.*

*Brotherhood of Painters, Decorators and Paperhangers,* 384 F.Supp. 1264, 1268 (D.S. D.1974); *Hochstadt v. Worcester Foundation for Experimental Biology,* 425 F.Supp. 318, 323 (D.Mass.), *aff'd,* 545 F.2d 222 (1 Cir. 1976). Here, it may be noted that no conciliation was attempted; consequently the failure to name the employers had no practical effect on this policy. Such a finding is not necessary to joinder, however, for numerous courts have found that the interests represented by Rule 19 and by enforcement of Title VII simply outweigh the interest in conciliation:

> "However, we are not convinced that the value of conciliation supersedes the value of enforcement, to the end that after a charge has been processed before the EEOC and court action commenced, the district court is powerless to order joinder under Rule 19(a) and is further required to dismiss the action under the indispensable party provisions of Rule 19(b). Where, as here, the chartering International was an obscure party, requiring court action to determine whether or not its presence in the action was necessary for complete relief among those already parties, to deny joinder under 19(a) would cripple the rights of the charging party as well as those of the party charged." *Evans v. Sheraton Park Hotel, supra,* 164 U.S.App.D.C. at 92, 503 F.2d at 183.

The absent employers here were "obscure" parties in the sense that plaintiffs apparently did not know them to be a source of discrimination until long after the EEOC charges were filed. Even after the employers' role was identified, it was not unreasonable, in the absence of knowledge of the relationships among the parties, to assume that complete relief could be obtained from the JATC alone. That the absent parties were "obscure" in this sense has not, however, generally been found to be a prerequisite to joinder pursuant to Rule 19(a) despite the failure to name parties before the EEOC. *Macklin v. Spector Freight Systems, Inc.,* 156 U.S.App.D.C. 69, 83 n. 25, 478 F.2d 979, 993 n.25 (1973) (dictum);

*Equal Employment Opportunity Commission v. McLean Trucking Co.*, 525 F.2d 1007, 1012 (6 Cir. 1975) ("indispensable" parties joined for purpose of interpreting collective bargaining agreement); *Held v. Missouri Pacific Railroad Co.*, 373 F.Supp. 996, 999 (S.D.Tex.1974) (dictum that "indispensable" parties may be joined); *Equal Employment Opportunity Commission v. Rexall Drug Co.*, 9 E.P.D. ¶ 9936, at 6931 (E.D.Mo.1974); *Ostapowicz v. Johnson Bronze Co., supra*, 369 F.Supp. at 531 (dictum); *Reyes v. Missouri-Kansas-Texas Railroad Co.*, 53 F.R.D. 293, 297 (D.Kan.1971); *Torockio v. Chamberlain Manufacturing Co.*, 51 F.R.D. 517, 519 (W.D.Pa.1970) (joinder pursuant to Rule 21 where insufficient facts for Rule 19 joinder); *Bremer v. Saint Louis Southwestern Railroad Co., supra*, 310 F.Supp. at 1340. This line of authority disposes of defendant's claim that failure to name the employers in charges before the EEOC is fatal to joinder under the circumstances presented here.

The same policies dispose of defendant's second contention: that joinder is barred by plaintiffs' failure to add the employers and unions within 90 days of receipt of a right-to-sue letter. Defendant has cited no authority for the proposition that this statute of limitations will bar joinder of necessary parties pursuant to Rule 19. None of the decisions dealing with failure to name parties in EEOC charges *supra*, addressed this issue, despite the fact that the statutory period will have run in most cases by the time a court has determined that absent parties must be joined. The Court concludes that the policies underlying Rule 19, which have been held to override the conflicting Title VII policy of conciliation, must also override the policy of finality expressed in this short limitations period.

Of course, a plaintiff cannot amend his complaint to allege an entirely new cause of action and add the parties necessary thereto after the period of limitations has passed. *See Marlowe v. Fisher Body*, 489 F.2d 1057, 1064 (6 Cir. 1973). But Title VII permits a claimant to seek judicial relief for "any discrimination like or reasonably related to the allegations of the EEOC charge," without returning to the agency for administrative consideration of the new charges. *Equal Employment Opportunity Commission v. Pacific Press Publishing Association, supra*, 535 F.2d at 1186; *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9 Cir. 1973). The present charge of maintaining a discriminatory referral system differs significantly from the original charge of discriminatory practices in placement of applicants on lists. But the new charge does not change the plaintiffs' basic contention: that discriminatory procedures in admission to defendant's apprenticeship program have drastically limited the ability of women to enter the carpentry trade. To anyone familiar with defendant's procedures, the shift in focus from the "list" to the "job" requirement for admission could reasonably have been expected to grow out of the original charge once information was made available as to the operation of the system. *See Gamble v. Birmingham Southern Railroad Co.*, 514 F.2d 678, 688–689 (5 Cir. 1975); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 399 (3 Cir. 1976). Thus, the amendment was within the scope of the original charges, and any parties necessary to the adjudication thereof may be joined at this time.

Although there is no procedural bar to joinder of the absent parties, the affected employers number in excess of 4500, and more than 60 local unions appear to be involved. Plaintiffs have represented that joinder is feasible without explaining how they intend to proceed in light of these numbers. The only alternatives appear to be certification of defendant classes or joinder of contractor associations in lieu of individual employer members, and District Councils, the Carpenters 46 Northern Counties Conference Board, or the International itself in lieu of union locals. That either of these alternatives can provide a feasible and adequate solution to the problems raised in Part III, *supra*, is open to serious question. The former would raise a host of questions under Rule 23, while the latter would raise further questions under Rule 19

as to whether individual employers and union locals remain indispensable parties despite the joinder of their representatives. Decision on these issues must, however, await plaintiffs' selection of a method of joinder and the submission of information not presently before the Court, including the precise number of employers affected, the number belonging to trade associations, the nature of those associations, their ability to represent and protect the interests of their members, their capacity to control and police individual members, and the relationships and respective roles of each of the various levels of union organization. Absent these facts, it is impossible to determine whether joinder may be accomplished as required by Rule 19(a).

If joinder cannot be accomplished, the facts discussed in Part III, *supra*, will require that the action be dismissed pursuant to Rule 19(b). Any relief directed to the JATC alone would create a substantial possibility of prejudice to both employers and unions, as well as to the JATC itself. No form of decree or protective provisions sufficient to avoid or reduce this prejudice has been suggested, and the Court is aware of none. Most significantly, there is no evidence that a judgment rendered in the absence of these parties would have any significant effect on the evil complained of in this action. Plaintiffs' alternative remedy is, unfortunately, burdensome and expensive: to pursue in individual lawsuits those employers alleged to have discriminated. However, the Court cannot on this ground alone countenance any further expenditure of judicial resources in an action so unlikely to lead to effective relief.

Plaintiffs have strenuously urged that joinder be postponed until after determination on the issue of liability. Although the Court may have the power to join parties to participate in the formulation of relief, *see United States v. Chesapeake & Ohio Railway Co.*, 471 F.2d 582, 592–593 (4 Cir. 1972), *cert. denied*, 411 U.S. 939, 93 S.Ct. 1893, 36 L.Ed.2d 401 (1973); *Pegues v. Mississippi State Employment Service*, 57 F.R.D. 102, 105 (N.D.Miss.1972), that procedure is appropriate only where, as in *United States v.*

*Chesapeake & Ohio Railway Co., supra*, the presence of those parties cannot immediately be determined to be necessary for complete relief under Rule 19(a)(1). Where, as here, it is clear from the outset that effective relief is impossible in the absence of the parties in question, it would be a monumental waste of resources to adjudicate the issue of liability before determining whether those parties can be joined. Moreover, where the absent parties claim interests that may be affected by a decree or that may generate relitigation, it is the exclusion of those parties from the liability phase of the litigation that may create the harms anticipated by Rule 19(a)(2). The proper course in such a case is plainly immediate joinder in order that all the issues may be litigated at one time. *See Pegues v. Mississippi State Employment Service, supra*, 57 F.R.D. at 105.

Accordingly, IT IS HEREBY ORDERED that defendant's motion to dismiss for lack of jurisdiction over the subject matter by reason of failure to exhaust state and administrative remedies is denied.

IT IS HEREBY FURTHER ORDERED that the employer contributors to the Carpenters Apprenticeship and Training Trust Fund for Northern California, and the local unions which refer apprentices registered with the defendant JATC to employment are indispensable parties in whose absence the action cannot in equity and good conscience proceed. If they are not joined within sixty (60) days of the date of this order, or such further time as the Court may, on good cause shown, allow, the action will be dismissed.